**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Greg Hubbard

    v.                             Civil No. 10-cv-365-LM
                                          Opinion No. 2013 DNH 165 P

Tyco Integrated Cable
Systems, Inc.

**O R D E R**

Greg Hubbard, a former employee of Tyco Integrated Cable Systems, Inc. ("Tyco") who was born and raised in England, is suing Tyco in five counts. He asserts: (1) two claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; and (2) three claims under New Hampshire's Law Against Discrimination, N.H. Rev. Stat. Ann. ("RSA") ch. 354-A.[1] Hubbard claims that he was subjected to a hostile work environment because of his national origin, and that Tyco terminated his employment because of his national origin and in retaliation for his complaints about discrimination in the workplace. Before the court are: (1) Tyco's motion for summary judgment; (2) Tyco's motion to strike certain material from Hubbard's Supplemented Memorandum of Law in Support of Objection to Defendant's Motion for Summary Judgment; and (3) Hubbard's Motion to Correct the Record. Each motion is duly opposed. The

---

[1] Hubbard initially asserted, but has since given up, a claim invoking 42 U.S.C. § 1981.

court heard oral argument on the motion for summary judgment on November 1, 2013.  For the reasons that follow, Tyco's motion for summary judgment is granted in part and denied in part, its motion to strike is denied as moot, and Hubbard's motion to correct the record is granted.

## Motion to Strike

Tyco moves "the Court [to] strike from the summary judgment record all conclusory allegations and improbable inferences that Plaintiff . . . has failed to substantiate with competent evidence."  Def.'s Mot. to Strike (doc. no. 51) 1.  In support of that request, Tyco asserts that: (1) Hubbard's Supplemented Memorandum of Law in Support of Objection to Defendant's Motion for Summary Judgment, document no. 56, includes factual references that lack any record citations; and (2) in various places where the memorandum does include record citations, the record does not support the proposition for which Hubbard has cited it.  The court shares many of Tyco's concerns.  However, because the background section in this order draws from Hubbard's memorandum only facts that are adequately supported by the record, Tyco's motion to strike is denied as moot.

**Motion to Correct the Record**

Hubbard also moves the court to take note of: (1) several corrections of erroneous citations to the record in his supplemented memorandum of law; and (2) one correction to a statement he made at oral argument.  With respect to Hubbard's correction of citation errors, his motion is granted.  In his second request, Hubbard asks the court to allow him to replace his representation, at oral argument, that he had not previously challenged the authenticity of a statement purportedly written by Christopher Long, and produced by Tyco in support of its motion for summary judgment, with a representation that he had, in fact, challenged the authenticity of that statement.  Hubbard's second request is also granted, but in light of Tyco's submission of an affidavit from Long that authenticates his written statement, see doc. no. 68, Hubbard's authenticity challenge is, in the end, unavailing.

**Motion for Summary Judgment**

A. Summary Judgment Standard

"Summary judgment is warranted where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  McGair v. Am. Bankers Ins. Co. of Fla., 693 F.3d 94, 99 (1st Cir. 2012) (quoting Fed. R. Civ. P. 56(a); citing Rosciti v. Ins. Co. of Penn., 659 F.3d 92, 96

(1st Cir. 2011).  "In determining whether a genuine issue of material fact exists, [the court] construe[s] the evidence in the light most favorable to the non-moving party and make[s] all reasonable inferences in that party's favor." Markel Am. Ins. Co. v. Díaz-Santiago, 674 F.3d 21, 30 (1st Cir. 2011) (citing Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004)).

"The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corp. de P.R. para la Diffusión Púb., 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)).  "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

"The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (quoting Iverson v. City of Bos., 452 F.3d 94, 98 (1st Cir. 2006)). "However, 'a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is

insufficient to discharge the nonmovant's burden.'" Sánchez-Rodríguez, 673 F.3d at 9 (quoting DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005)).  "Rather, the party seeking to avoid summary judgment must be able to point to specific, competent evidence to support his [or her] claim." Sánchez-Rodríguez, 673 F.3d at 9 (quoting Soto-Ocasio v. Fed. Ex. Corp., 150 F.3d 14, 18 (1st Cir. 1998)) (internal quotation marks omitted).

B. Background

     Unless otherwise indicated, the following facts are undisputed.

     Hubbard spent his childhood in England and speaks with a British accent.  In the fall of 2007, he began working for Tyco as a T3 Operator, which was an entry-level position.  While working as a T3 Operator, Hubbard experienced no discrimination based upon his national origin.

     In November of 2007, Hubbard was promoted to the position of T1 Inspector.  In that position, he inspected the work of operators in Tyco's Repeater Assembly Building ("RAB").  Before he accepted the promotion, some of his co-workers advised him not to accept it, and warned him that inspectors were generally given a hard time by the operators whose work they inspected. After Hubbard was promoted, he became the target of hostile

comments from several operators who referred to his national

origin in the following ways:

> • After Hubbard rejected a part made by Derek
> Thompkins, Thompkins called him an "English mother"
> and a "limie fuck."  Def.'s Statement of Undisputed
> Material Facts (hereinafter "Def.'s Facts"), Ex. D,
> Hubbard Dep. (doc. no. 32-4) 122:4, 11.

> • Linda Tarnawski told an employee Hubbard was
> training: "[Y]ou don't want to learn anything from
> him.  He's an English fuck up.  He don't know what
> he's talking about.  What would he know if he's
> English anyway."  Id. at 126:14-17.

> • Tarnawski left notes on parts saying "have the
> English guy not inspect this," id. at 126:23, and
> "[d]on't let the English guy touch it," id. at 127:17-
> 18.

> • Katherine Merrill once told an employee Hubbard was
> training: "you don't want to listen to that English
> faggot because he doesn't know what he's talking
> about."  Id. at 129:11-13.

> • After Hubbard called out Bill Rogers for his conduct
> toward a co-worker of Asian descent, Rogers said:
> "Mind your fucking business . . . you English faggot."
> Id. at 135:1-10.

> • Rogers said things about Hubbard's national origin
> daily, see id. at 135:14-15, once wrote "English
> faggot" in the condensation on a window in a door that
> Hubbard frequently used, id. at 135:20, and once
> referred to Hubbard as "that English faggot right
> there," id. at 136:17.

Some Tyco employees resented Hubbard because he was new, had

been promoted quickly, held authority, was good at his job, was

a hard worker, and worked a large amount of overtime.  Moreover,

the operators who made comments that included references to

Hubbard's national origin often did so in the context of challenges to his status and performance as an inspector.

In late December of 2008, Hubbard was involved in an altercation with Bill Rogers, an operator.  Both Hubbard and Rogers were suspended, and Hubbard was issued an Employee Warning Notice ("Warning") that provided, in pertinent part:

> On Wednesday, 12/24/2008 you were suspended for one (1) week after an altercation with Bill Rogers on Tuesday, 12/23/2008 that resulted in you having inappropriate conversations with fellow inspectors and operators regarding the incident after you spoke with your manager and HR.  Whenever you are privy to certain information, especially information regarding an ongoing investigation, you need to keep those facts to yourself and not spread that information to fellow employees.  This type of behavior creates animosity with fellow employees.

Vanderzanden Aff., Ex. 7 (doc. no. 34-7), at 2.  The Warning was signed by: (1) Hubbard; (2) his supervisor, Frank Faria; and (3) two managers: Craig Murphy, who was Tyco's director of quality and testing, and Joe DeRoy, Tyco's human resources manager.  See id.  Finally, the Warning provided that it would remain in effect until June 28, 2009.  See id.

On January 11, 2009, Hubbard sent Faria an e-mail in which he withdrew a previous request for a transfer to a different department.  That e-mail stated, in pertinent part:

> I love my job and always have, I would love to stay here and continue my job, as long as if any situation comes along and I continue to do the right thing and tell the appropriate people it gets taken care of.  It

> is not fair that I have to deal with some of these
> situations due to being very open minded, and blunt
> with people.  . . .  The only concern I have is others
> trying to get me out of here and its going to be hard
> to deal with that on a daily basis, but I can handle
> it and always have been able too.

Pl.'s Mem. of Law, Ex. 6 (doc. no. 39-7), at 13.

On February 4, 2009, Hubbard met with DeRoy and Murphy. While the purpose of that meeting is disputed, it is undisputed that: (1) Murphy, DeRoy, and Hubbard discussed a variety of workplace issues of concern to Hubbard; and (2) during the meeting, DeRoy asked Hubbard to put his concerns in writing so they could be investigated and dealt with.  DeRoy prepared a memorandum to the file to document the meeting.  Most relevant to the claims in this case, DeRoy noted that Hubbard mentioned negative comments directed toward him, disrespectful behavior, off-color jokes in the break area, and failures by management to correct those problems.  DeRoy's notes do not indicate that Hubbard complained about discrimination based upon his national origin.

The day after DeRoy and Murphy met with Hubbard, Tyco employee Christopher Long provided a statement, at the request of Tyco management, concerning conversations he had had with Hubbard.  Among other things, Long reported:

> Greg, has confide[d] in me multiple times associated
> with work related issues where he seemed to be having
> problems . . . .  After his recent suspension over the

conflict with Bill Rogers, he approached me to give
his side of the story.  .  .  .  During that
conversation I told him that he is on everyone's radar
and that he needed to avoid further confrontations,
that he's now the common denominator in multiple
issues that have taken place.  After I gave him that
speech, he started talking about how he is being
discriminated against because he's English, and if
this were any other company Bill would have been
fired.  Again I suggested he stay on the straight and
narrow for a whole, avoid confrontation.

The last two weeks I have not been able to go into RAB
without being confronted by Greg with more gossip
associated with this type of perpetual conflict.

Most recently on the evening of 2/4/09, Greg, saw me
having a conversation with Kevin Coughlin . . . .
After Kevin walked away Greg asked me if we were
talking about him (he appeared paranoid), I replied
no.  He said that he had to talk to me about something
outside and portrayed it as very dramatic, which made
me nervous.  Once we were outside Greg started talking
about Charles Pixley, Scott Williams and how he has
documented them keeping things behind closed doors; he
also suggested their jobs could be on the line and
that he didn't have a lawyer, but was thinking about
getting one (something to that effect).  I didn't know
where the conversation was going or coming from, I was
uncomfortable, and I withdrew from the conversation.
Within five minutes I went to Kevin Coughlin to let
him know what Greg was saying.

Vanderzanden Aff., Ex. 10 (doc. no. 34-10), at 2.

After his February 4 meeting with DeRoy and Murphy, Hubbard

prepared an undated statement listing twelve incidents that

concerned him.  Most relevant to the claims in this case,

Hubbard's list included: (1) a January 2008 incident in which

Bill Rogers "attacked Putu Widiartha with verbal abuse,"

Vanderzanden Aff., Ex. 4 (doc. no. 34-4), at 2; (2) a March 2008

incident in which Derek Thompkins "attacked [him] with verbal abuse after a part was rejected," id.; (3) a July 2008 incident in which Rogers told ethnic jokes that made an Indonesian woman cry, see id.; (4) a July 2008 incident in which he overheard Linda Tarnawski use profane language while talking about him to another inspector, see id. at 4; (5) an August 2008 incident in which he "was verbally attacked by Derek Thompkins over a rejected part again," id. at 3; (6) a second August 2008 incident in which Thompkins "attacked [him] with verbal abuse," id.; (7) a September 2008 incident in which he overheard a conversation between Rogers and another employee in which Rogers "made a couple of (English) remarks as [he] walk[ed] by" and referred to him as "that English faggot," id.; and (8) the altercation with Rogers that led to his suspension, during which Rogers directed "profane language" toward him, id. at 4.

Hubbard says that he used the generic term "verbal abuse" rather than specifically reporting comments referring to his national origin because "DeRoy instructed [him] to leave out the 'name calling' or anything about his heritage."  Pl.'s Supp. Mem. of Law (doc. no. 56) ¶ V (p. 40) (citing Ex. 3, Hubbard Dep. (doc. no. 39-4) 190:2-6).  Hubbard gave his written statement to DeRoy on either Friday, February 6, or Monday, February 9; the deposition testimony offered by both Hubbard and

DeRoy is ambiguous on this point.[2]   The record includes an
undated document authored by DeRoy, titled "Greg Hubbard's
charges – 2/09/2009" that addresses, point by point, the
incidents listed in Hubbard's written statement.  <u>See</u>
Vanderzanden Aff., Ex. 21 (doc. no. 34-21).

According to the statement of facts in Hubbard's
supplemented memorandum of law, he had another meeting with
DeRoy and Murphy.  The statement of facts continues: "Deroy
alleges that he asked Hubbard to respond in writing to Long's
allegations."  Pl.'s Supp. Mem. of Law (doc. no. 56) ¶ 61
(citing Ex. 1, DeRoy Dep. (doc. no. 39-2) 98:19-22, 105:7-13).

On February 6, Hubbard met with DeRoy.  DeRoy says that at
that meeting, he told Hubbard not to contact either Long or
Kevin Coughlin.  Hubbard says that DeRoy told him no such thing.
Either way, it is undisputed by Hubbard that at the February 6

---

[2] <u>Compare</u> Pl.'s Mem. of Law, Ex. 3, Hubbard Dep. (doc. no.
39-4) 79:22-80:4 ("We met, I believe, one more time after the
text message [Hubbard sent Long on February 6] and that was the
very next day that I [came] in and he had asked me to write
everything down.  I did, and then was told to hand in my badge
and I'm suspended pending investigation.") <u>with</u> <u>id.</u> at 183:2-5
("I don't recall the day I gave it [his written statement] to
[DeRoy].  He asked me one time and I gave it to him, I believe,
the very next day [i.e., February 5], but I'm not sure of the
date.").  In his own deposition, DeRoy stated that Hubbard gave
him his written statement at their final face-to-face meeting on
February 6, <u>see</u> <u>id.</u>, Ex. 1, DeRoy Dep. (doc. no. 39-2) 110:15-
111:4, 113:21-114:6, but also indicated that his last meeting
with Hubbard took place on February 9, <u>see</u> <u>id.</u> at 168:20-23.

meeting, DeRoy: (1) spoke with him about his relationship with Long, see Pl.'s Supp. Mem. of Law (doc. no. 56) ¶ 68; and (2) immediately after speaking with Hubbard about Long, told Hubbard that he didn't "want . . . for any pot to be stirred," Pl.'s Mem. of Law, Ex. 3, Hubbard Dep. (doc. no. 39-4) 109:14.

After his meeting with DeRoy on February 6, Hubbard was involved in a conversation with Long, conducted by telephone and text message.[3]  Long described that conversation, in a letter to whom it may concern, dated February 9, 2009, in the following way:

> I was at my desk at 6:20 pm last Friday night (2/6/09) when Greg contacted me from an unknown number; he was extremely upset shouting at me and telling me I have "big balls" in regards to my written statement to Joe Deroy from the day prior.  I was nervous and hung up the phone.  I immediately contacted my manager John Towne at home.  He suggested I call Joe Deroy, which I did.
>
> After I notified Joe and John I received a text message from Greg that seemed aggressive and had a threatening tone, the text messages are the following:
>
> "d up not true story I cant believe it and u have the nerve to fucking lie WOW u r a brave man u and the other 1 to sit there and lie u sit there and try" Sent 2/6/09 at 6:37 pm
>
> "to get urself to look good with some bulshit lies against me and my family u have balls please show this to them so we can talk about everything that" Sent 2/6/09 at 6:37 pm

---

[3] Whether that communication was initiated by Hubbard or Long is a matter of dispute but, in the end, is immaterial.

"goes on monday: everything" Sent 2/6/09 at 6:38 pm.

After reading the text messages I called him right
back to ask if he was indeed threatening me, he said
he wasn't, I hung up the phone.

Vanderzanden Aff., Ex. 9 (doc. no. 34-9), at 2.

On February 12, 2009, DeRoy spoke with Hubbard by telephone

and informed him that Tyco had decided to terminate his

employment.  It is undisputed that DeRoy told Hubbard he was

being discharged for insubordination.  The record includes

DeRoy's notes on his telephone conversation with Hubbard.  Those

notes include the following relevant comments:

I told Greg the decision was to terminate employment
based on insubordination by making contact with Chris
Long against direct instructions from me not to do so
and for inappropriate intimidating remarks to a member
of management.

Greg started to explain his side of the story with the
communication with Chris Long Friday evening 2/[6]/09.
I explained that I had a signed written statement from
Chris Long stating it was Greg who made first contact.
I went on to explain to Greg, this was the same reason
[he was] suspended on 12/24/2008 during the Bill
Rogers incident.  I explained he was instructed by me
after our phone conversation on the 23rd of December
not to say anything to anyone as there was an
investigation ongoing and he went back to his area and
told individuals that Bill Rogers was going to be
suspended when he came in to work on the 24th and may
even lose his job.  Greg replied back "this is the
only thing I did wrong during the entire ordeal."  I
went on to say, you contacted Chris Long Friday night
2/[6]/2009 and gave him an ear full.  . . .  I
instructed you in my office Friday afternoon
specifically not to contact anyone.

Vanderzanden Aff., Ex. 8 (doc. no. 34-8), at 2.

Based upon the foregoing, Hubbard claims that Tyco: (1) discriminated against him based upon his national origin by suspending him in December of 2008 and by discharging him, in violation of RSA 354-A:7, I (Count IV); (2) discriminated against him based upon his national origin by tolerating the existence a hostile work environment in violation of 42 U.S.C. § 2000e-2(a)(1) and RSA 354-A:7, I (Counts II and III); and (3) retaliated against him for opposing discrimination by discharging him, in violation of RSA 354-A:19 and 42 U.S.C. § 2000e-3(a) (Counts V and VI).

C. Discussion

Tyco moves for summary judgment on all five remaining counts of Hubbard's complaint.  The court begins with Hubbard's hostile-work-environment claims and then turns to his discrimination and retaliation claims.

1. Hostile Work Environment (Counts II and III)

Counts II and III both assert that Tyco subjected Hubbard to a work environment permeated by hostility engendered by his national origin.  Neither count specifies the conduct on which it is based but, rather, each incorporates, by reference, all the paragraphs that precede it.  In the fact section of his

14

complaint, Hubbard identified the following acts of hostility at Tyco that were based upon his national origin:

13.   At the end of July or in early August the Plaintiff was training a new inspector named Brett Turgeon.  Linda Turnowski, a friend of Mr. Rogers, approached Mr. Turgeon and told him "Don't listen to that stupid f---.  He is an English idiot.  He doesn't know what he is talking about."

14.   Around the same time another of Mr. Rogers' friends, Kathy Merrill, told Mr. Turgeon "Don't listen to the English guy, he is an idiot."

. . . .

16.   Following a rejection of one of Mr. Thompkins' parts, the Plaintiff overheard Bill Rogers tell Mr. Thompkins, "He's f---in English, what the f--- does he know?"

17.   The harassment continued from the RAB Department.  Small comments in the break room, minor annoyances with lunches etc.  The comments were derogatory, referred to my being British, and were made loud enough so that I could hear them.  The comments created an extremely hostile work environment for me.

18. In September 2008 the Plaintiff was in the break room.  Mr. Rogers and his supervisor Charles Pixley were in the break room as well.  They began talking about the Plaintiff in a derogatory manner. The Plaintiff did nothing for a few moments until Mr. Rogers said "You English Faggot".  The Plaintiff reacted and asked what the problem was, but both Mr. Rogers and Mr. Pixley walked out of the break room.

. . . .

22.   In December 2008, after reporting his concerns to Mr. Deroy, the Plaintiff passed Mr. Rogers in the RAB department.  Mr. Rogers said something to the Plaintiff as he passed.  He then turned and put his hands on the Plaintiff in a very threatening

> manner and said, "I'm not going to fight you because
> you would beat me, but I am going to give you all the
> shit you deserve you English faggot."

Compl. (doc. no. 1) 3-4.  In his supplemental memorandum of law,

Hubbard appears to elaborate on the allegations in paragraph 17

of his complaint by quoting the following testimony from his

deposition:

> Oh, every day, [Rogers] would say something every
> single day about my nationality and origin, every day.
> It would – he would even write notes and put them in
> the lunch cooler.  And he would write things when it
> was cold outside in January, heat inside the building,
> you got the steam on the window, he would write
> English faggot on the door to go into RAB.  Comments,
> I mean, there's such a long list of what that guy
> actually really said to me.  I mean, the pride of my
> country, he would say things, you know, just about
> British people, about me, you know, about how he hated
> all of us.  And if you weren't American you shouldn't
> be at this company, you shouldn't be working in
> America.

Pl.'s Supp. Mem. of Law (doc. no. 56) ¶ 19 (quoting Pl.'s Mem.

of Law, Ex. 3 (doc. no. 39-4), at 135:14-136:4).  It is

undisputed that Rogers' comments did not begin until after

Hubbard became an inspector.

Tyco argues that it is entitled to judgment as a matter of

law on Hubbard's hostile-work-environment claims because the

undisputed record demonstrates that Hubbard cannot establish two

elements of those claims: (1) harassment that was based upon his

national origin; and (2) harassment that was severe and

pervasive enough to alter the conditions of his employment.  The court does not agree.

Count II arises under Title VII, while Count III arises under RSA 354-A.  "Because the New Hampshire Supreme Court relies on Title VII cases to analyze claims under RSA 354-A, the court will address [Hubbard's state and federal] claims together using the Title VII standard."  Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc., 822 F. Supp. 2d 84, 92 (D.N.H. 2011) (citing Madeja v. MPB Corp., 149 N.H. 371, 378 (2003); Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 856–57 (1st Cir. 2008); Slater v. Town of Exeter, No. 07-cv-407-JL, 2009 WL 737112, at *4 n.5 (D.N.H. Mar. 20, 2009)).

"Title VII prohibits employers from discriminating against individuals 'because of [their] race, color, religion, sex, or national origin . . . .'" Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 186 n.5 (1st Cir. 2011) (quoting 42 U.S.C. § 2000e-2(a)(1)).  "Requiring a person 'to work in a discriminatorily hostile or abusive environment' violates Title VII." Gerald v. Univ. of P.R., 707 F.3d 7, 17 (1st Cir. 2013) (quoting Valentín-Almeyda v. Mun'y of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006); citing Harris v. Forklift Sys., 510 U.S. 17, 21 (1993)).  Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is

17

sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment."

Torres-Negrón v. Merck & Co., 488 F.3d 34, 39 (1st Cir. 2007)

(quoting Harris, 510 U.S. at 21).

　　　　Turning to the elements of his claim, for Hubbard to

prevail, he must show:

> (1) that [he] is a member of a protected class; (2)
> that [he] was subjected to unwelcome harassment; (3)
> that the harassment was based on [his] membership [in]
> the protected class; (4) that the harassment was so
> severe or pervasive that it altered the conditions of
> [his] employment and created an abusive work
> environment; (5) that the objectionable conduct was
> objectively and subjectively offensive, such that a
> reasonable person would find it hostile or abusive and
> the victim in fact did perceive it to be so; and (6)
> that some basis for employer liability has been
> established.

Torres-Negrón, 488 F.3d at 39 (citing O'Rourke v. City of

Providence, 235 F.3d 713, 728 (1st Cir. 2001); Faragher v. City

of Boca Ratón, 524 U.S. 775, 787–89 (1998)).

### a. Harassment Based on National Origin

　　　　Tyco argues that the undisputed facts of this case

demonstrate that while Hubbard was subjected to verbal abuse by

several operators, that abuse was based on his being an

inspector, not his membership in a class protected by Title VII.

Tyco has, indeed, produced undisputed evidence that nobody at

Tyco called Hubbard names that referred to his national origin

before he was promoted.  See Def.'s Facts (doc. no. 32) ¶ 11;
Pl.'s Supp. Mem. of Law (doc. no. 56) ¶¶ A & B (p. 36)
(disputing paragraphs 8 and 11 of Tyco's statement of facts, but
not disputing paragraph 11).  Moreover, not all harassment that
mentions a person's membership in a protected class is
necessarily based upon that status.  See, e.g., Rivera v. P.R.
Aqueduct & Sewers Auth., 331 F.3d 183, 191 (1st Cir. 2003).

    Here, however, several factors counsel in favor of letting
a jury decide whether Hubbard was harassed because of his
national origin, or for some other reason.  First, Hubbard has
produced evidence that references to his national origin were
far more frequent than references to the plaintiff's religion in
Rivera, which supports an inference that anti-English animus was
much closer to the surface at Tyco than was the case for anti-
Catholic animus in the workplace in Rivera.  Beyond that, a jury
could reasonably see anti-English animus in all the name-calling
that linked a reference to Hubbard's national origin with a
derogatory reference to his intelligence or his sexuality.  In
short, while a jury could conclude that Hubbard was harassed
because he was an inspector, and his national origin was simply
a tool his harassers could use to intensify their verbal attacks
against him, the court concludes that the question of whether

Hubbard was harassed because he is English is best left to a jury.

### b. Severe or Pervasive Harassment

Tyco next argues that the harassment Hubbard endured was not "so severe or pervasive that it altered the conditions of [his] employment and created an abusive work environment," Torres-Negrón, 488 F.3d at 39.  Regarding that element of Hubbard's claim, the Supreme Court has explained that there is no "mathematically precise test."  Harris, 510 U.S. at 22. Rather,

> whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Harris, 510 U.S. at 23.  None of the foregoing "factors is individually determinative of the inquiry."  Ayala-Sepúlveda v. Mun'y of San Germán, 671 F.3d 24, 31 (1st Cir. 2012) (citation omitted); see also Gerald, 707 F.3d at 18 (citation omitted).

"Title VII does not create a general civility code for the workplace."  Ahern v. Shinseki, 629 F.3d 49, 59 (1st Cir. 2010) (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Ríos-Jiménez v. Principi, 520 F.3d 31, 44 (1st Cir. 2008)).  "The workplace is not a cocoon, and those who labor in

it are expected to have reasonably thick skins . . . to survive
the slings and arrows that workers routinely encounter in a
hard, cold world." Alvarado v. Donahoe, 687 F.3d 453, 462 (1st
Cir. 2012) (quoting Suárez v. Pueblo Int'l, Inc., 229 F.3d 49,
54 (1st Cir. 2000)).  Accordingly, the basic "thrust of [the]
inquiry is to distinguish between the ordinary, if occasionally
unpleasant, vicissitudes of the workplace and actual
harassment." Noviello v. City of Bos., 398 F.3d 76, 92 (1st
Cir. 2005) (citing Faragher, 524 U.S. at 788).

Finally, "because the inquiry into the existence of a
hostile work environment is fact specific, 'the determination is
often reserved for a fact finder.'" Vega-Colón v. Wyeth Pharms.
Inc., 625 F.3d 22, 32 (1st Cir. 2010) (quoting Pomales v.
Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006)).
Such is the case here.

With regard to frequency, Hubbard has produced evidence
that, for some period of time – and the court may reasonably
infer that period to span several months – he was subjected to
daily verbal abuse from Rogers.  While most of the alleged abuse
was verbal, Hubbard has also produced evidence that, on one
occasion, Rogers physically confronted him by bumping into him
in the break room and trying to get chest-to-chest with him.
See Pl.'s Mot. to Supplement, Ex. 1, Hubbard Dep. (doc. no. 48-

1) 330:17, 331:4.  He has also produced evidence that, after his
confrontation with Rogers in the break room, he began taking
half days off from work, due to the stress engendered by the
harassment he was enduring.  See id. at 298:3-300:22.  While
Hubbard's ability to demonstrate that he was subjected to severe
or pervasive harassment that altered the conditions of his
employment is a close call, his evidence is not so deficient
that the court may determine, as a matter of law, that his
harassment was not severe or pervasive, as those terms are used
in the context of Title VII.

### c. Summary

Tyco has advanced two arguments in support of its motion
for summary judgment on the hostile-work-environment claims
stated in Counts II and III.  Because Hubbard has produced
sufficient evidence to create trialworthy issues of fact
concerning the cause for his harassment and its severity or
pervasiveness, Tyco is not entitled to judgment as a matter of
law on Counts II and III.

### 2. Discrimination (Count IV)

In his complaint, Hubbard frames his state-law
discrimination claim in the following way:

42.  The allegations set forth in paragraphs 1
through 42 [sic] above are reasserted in this count as
if set forth separately herein.

43.  The Defendant discriminated against the
Plaintiff because of his national origin and the above
conduct constitutes national origin discrimination in
violation of RSA 354-A:7, I.

Compl. (doc. no. 1) 7.  Nowhere, however, does Count IV

specifically identify the conduct on which it based.  In his

supplemented memorandum of law, the only prima facie case

Hubbard cites is the one for employment termination cases.  See

Pl.'s Supp. Mem. of Law (doc. no. 56) 19.  Likewise, even a

generous reading of Hubbard's supplemented memorandum suggests

only a single discriminatory act, Hubbard's discharge.

Yet, at oral argument, Hubbard identified a second

discriminatory act: Tyco's decision to suspend him in late 2008,

for having inappropriate conversations with fellow inspectors

and operators in the aftermath of his altercation with Bill

Rogers.  In the interest of giving Hubbard, the non-moving

party, every reasonable advantage, the court will consider

claims that Tyco violated Hubbard's rights under RSA 354-A:7, I,

by: (1) suspending him in December of 2008; and (2) discharging

him.  Before turning to those two claims, however, I will

outline the relevant law.

As with Count III, the court will analyze the state-law

claims asserted in Count IV under the standard applicable to a

Title VII claim.  See Hudson, 822 F. Supp. 2d at 92.  Because Hubbard is "unable to offer direct proof of [Tyco's] discriminatory animus," his claim is subject to "the now-familiar three-step framework set forth in McDonnell Douglas." Espinal v. Nat'l Grid NE Holdings 2, LLC, 693 F.3d 31, 34-35 (1st Cir. 2012) (quoting Udo v. Tomes, 54 F.3d 9, 12 (1st Cir. 1995)).

Under the framework first outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), "the plaintiff must [first] establish a prima facie case of discrimination."  Cham v. Station Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)).  The prima facie case must be established "by a preponderance of the evidence."  Aly v. Mohegan Council, Boy Scouts of Am., 711 F.3d 34, 46 (1st Cir. 2013) (citing Goncalves v. Plymouth Cnty. Sheriff's Dep't, 659 F.3d 101, 105 (1st Cir. 2011)).  "Meeting the initial prima facie requirement is 'not especially burdensome.'"  Martinez-Burgos v. Guayama Corp., 656 F.3d 7, 12 (1st Cir. 2011) (quoting Greenberg v. Union Camp Corp., 48 F.3d 22, 26 (1st Cir. 1995); Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir. 2003) (describing burden of establishing prima facie case as "not onerous," "easily made," and a "small showing")).  "Once the plaintiff makes out a prima

24

facie case, the burden of production shifts to the defendant to produce evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." Cham, 685 F.3d at 94 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993); citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)) (internal quotation marks omitted).

"If the defendant produces such evidence [i.e., evidence of a legitimate nondiscriminatory reason for its employment action], the McDonnell Douglas framework 'disappear[s]' and the sole remaining issue is 'discrimination vel non,'" leaving the plaintiff "an opportunity to show that the reasons offered by the defendant were a pretext for discrimination." Pearson v. Mass. Bay Transp. Auth., 723 F.3d 36, 40 (1st Cir. 2013) (quoting Cham, 685 F.3d at 94; citing Reeves, 530 U.S. at 143); see also Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 470 (1st Cir. 2010) ("If the employer [articulates a legitimate, non-discriminatory for its adverse employment action], the focus shifts back to the plaintiff, who must then show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory.") (citing Smith v. Stratus Computer, 40 F.3d 11, 16 (1st Cir. 1994)).  Finally, "[t]he ultimate burden of persuasion always

remains on the plaintiff . . . ." Cham, 685 F.3d at 94 (citing Reeves, 530 U.S. at 143; Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 447–48 (1st Cir. 2009)).

### a. Hubbard's Suspension

The problem with entertaining a claim that Hubbard was suspended on account of his national origin is that there was nothing in his complaint to alert Tyco that he was making such a claim.  Consequently, Tyco has framed no arguments to defeat that claim, and the court has little guidance as to how to analyze it.  The only real clues to this claim appear under the heading "Disparate Treatment" in Hubbard's supplemented memorandum of law.  In that section of his memorandum, in support of an argument that evidence of disparate treatment may prove that the explanation Tyco gave for discharging him was pretextual, Hubbard asserts that he was suspended for doing something that another Typo employee also did, without adverse consequences.  Accordingly, the court will focus on that comparison as it applies the McDonnell Douglas framework to Hubbard's disparate-treatment claim arising from his suspension.

As noted, Hubbard has not identified the elements of a prima facie case of discrimination based upon an adverse employment action other than discharge.  However, to establish a

prima facie case of discrimination based upon his suspension,
Hubbard must show that he:

> (1) was a member of a protected class, (2) met the
> employer's legitimate job-performance expectations,
> (3) was [suspended], and (4) that [Tyco] . . . did not
> treat members of the protected class neutrally [when
> handing out suspensions].

Udo, 54 F.3d at 12 (citing LeBlanc v. Great Am. Ins. Co., 6 F.3d
836, 842 (1st Cir. 1993)).  Bearing in mind that "'[t]he time to
consider comparative evidence in a disparate treatment case is
at the third step of the burden-shifting ritual, when the need
arises to test the pretextuality vel non of the employer's
articulated reason for having acted adversely to the plaintiff's
interests,' as opposed to as part of a plaintiff's prima facie
case," Cham, 685 F.3d at 94 n.4 (quoting Kosereis, 331 F.3d at
213; citing Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19
(1st Cir. 1999)), the court presumes that Hubbard has
established his prima facie case.  In turn, the Warning that
Tyco issued to Hubbard on December 29, 2008, see Vanderzanden
Aff., Ex. 7 (doc. no. 34-7), contains sufficient evidence of a
legitimate nondiscriminatory reason for Hubbard's suspension,
i.e., his conversations with fellow employees after talking with
management about his altercation with Rogers.  Thus, it is
necessary to proceed to the third stage of the McDonnell Douglas
framework.

"To avoid summary judgment at the third stage in the
McDonnell Douglas framework, '[Hubbard] must introduce
sufficient evidence to support two findings: (1) that [Tyco]'s
articulated reason [for suspending him] . . . is a pretext, and
(2) that the true reason is discriminatory." Espinal, 693 F.3d
at 35 (quoting Udo, 54 F.3d at 13; citing Smith, 40 F.3d at 16;
Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 34 (1st Cir.
2001)).  While there are several ways in which a Title VII
plaintiff may establish pretext, Hubbard focusses on one, his
assertion that he was treated less favorably than Derek
Thompson, who also spoke with a fellow employee about a matter
under investigation, but was not suspended for doing so.  His
argument is not persuasive.

As a legal matter, "[d]isparate treatment may be 'competent
proof that the explanation given for the challenged employment
action was pretextual, provided the plaintiff-employee can make
a preliminary showing that others similarly situated . . . in
all relevant respects were treated [more advantageously] by the
employer.'" Aly, 711 F.3d at 46 (quoting Straughn, 250 F.3d at
43-44).  Hubbard frames his disparate-treatment argument in the
following way:

> Despite the Defendant's denial, there is a
> specific incident involving both Hubbard and another
> employee that are identical yet Hubbard was
> disciplined and the other employee was not.  Hubbard

> was suspended in December 2008 after he was assaulted
> by Rogers.  Hubbard was allegedly suspended because
> after speaking with Deroy about the incident, Hubbard
> allegedly told other employees Rogers might be
> suspended or lose his job.
>
> In June of 2008, Thompkins, an American, did the
> exact same thing.  Thompkins had spoken with a
> manager, Matt Labounty, about an incident with another
> employee named Jake Joslin.  Thompkins admitted that
> after speaking with Labounty, Thompkins told Joslin:
> "he might find himself looking for another job."
> There was no indication in the file that Thompkins was
> ever disciplined in any way, much less being suspended
> for five days without pay.  This is a clear indication
> that by December of 2008 the Defendant was not
> interested in listening to Hubbard's complaints about
> discrimination any longer and instead started to
> encourage him to leave.

Pl.'s Supp. Mem. of Law (doc. no. 56) 28 (citations to the

record omitted).  In support of his argument that he and

Thompkins were similarly situated, but were treated differently

after engaging in similar conduct, Hubbard produced and cites a

written statement Thompkins gave to Philip Williams.  In it,

Thompkins described a conversation he had with another Tyco

employee, Jake Joslin.  See Pl.'s Mem. of Law, Ex. 2 (doc. no.

39-3), at 49.

Hubbard's argument fails, however, because he and Thompkins

were not similarly situated.  When basing a pretext argument on

disparate treatment, "the plaintiff's case and the comparison

cases that [he] advances need not be perfect replicas, they must

closely resemble one another in respect to relevant facts and

circumstances." Straughn, 250 F.3d at 44 (quoting Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996)). According to the Warning he received, Hubbard was suspended for "having inappropriate conversations with fellow inspectors and operators regarding the incident [with Rogers] after [he, Hubbard] spoke with [his] manager and HR." Vanderzanden Aff., Ex. 7 (doc. no. 34-7), at 2. The Warning went on to inform Hubbard of his obligation to keep to himself information about ongoing investigations, in the interest of avoiding animosity with fellow employees. See id.

What differentiates Thompkins' conversation with Joslin from the conversation(s) for which Hubbard was suspended is the fact that Thompkins spoke to Joslin at the request of Matt Labounty, a day shift supervisor. See Pl.'s Mem. of Law, Ex. 2 (doc. no. 39-3), at 49. Suffice it to say that an employee spreading rumors about a fellow employee after talking with management is not situated similarly to an employee providing counseling to a fellow employee, at the behest of management. In short, Hubbard has failed to produce evidence of disparate treatment from which a reasonable jury could determine that the reason Tyco gave for suspending him in 2008 was pretextual. Accordingly, Tyco is entitled to judgment as a matter of law on

Hubbard's claim that Tyco discriminated against him on account of his national origin by suspending him.

### b. Hubbard's Discharge

To establish his prima facie case of discrimination based upon his discharge, Hubbard must show that:

> (1) he . . . is a member of a protected class; (2) possessed the necessary qualifications and adequately performed his . . . job; (3) was nevertheless dismissed . . .; and (4) [Tyco] sought someone of roughly equivalent qualifications to perform substantially the same work.

Aly, 711 F.3d at 46 (citing Rodriguez-Torres v. Carib. Forms Mfr., Inc., 399 F.3d 52, 58 (1st Cir. 2005)).

Tyco argues that Hubbard has failed to establish a prima facie case of discrimination because: (1) his contact with Long on February 6 precludes him from establishing that he was performing his job in a manner that met Tyco's legitimate expectations; and (2) he has not established that he was treated differently than similarly situated employees.  Tyco's first argument is directed to the second element of the prima facie case and his second argument appears to be directed toward the fourth element.  All agree that Hubbard has established the first and third elements of his prima facie case; his English origin places him in a protected class, and Tyco discharged him.

With regard to the second element of the prima facie case, a plaintiff must establish that "he was performing his job at a level that rules out the possibility that he was fired for job performance." Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003). Tyco identifies Hubbard's communication with Long on February 6 as undisputed evidence that precludes Hubbard from establishing that he was adequately performing his job at the time of his discharge.

However, "[w]hen assessing whether a plaintiff has met [his] employer's legitimate expectations at the prima facie stage of a termination case, 'a court must examine plaintiff's evidence independent of the nondiscriminatory reason "produced" by the defense as its reason for terminating plaintiff.'" Quinn-Hunt v. Bennett Enters., Inc., 211 F. App'x 452, 457 (6th Cir. 2006) (quoting Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-61 (6th Cir. 1999); citing Tysinger v. Police Dep't, 463 F.3d 569, 571 (6th Cir. 2006) ("For purposes of the prima facie analysis, a plaintiff's qualifications are to be assessed in terms of whether he or she was meeting the employer's expectations prior to and independent of the events that led to the adverse action."); Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 585 (6th Cir. 2002)).

Because Tyco identifies nothing other than the February 6 incident to support its argument that Hubbard cannot establish the second element of his prima facie case, the court assumes that Hubbard has established that he was adequately performing his job at the time of his discharge.  Cf. Timm v. Ill. Dep't of Corr., 335 F. App'x 637, 643 (7th Cir. 2009) ("where an employee was fired for a sudden and egregious breach of policy, we assume this prong [i.e., the second element of the prima facie case] has been met") (citing Jones v. Union Pac. R.R. Co., 302 F.3d 735, 742 (7th Cir. 2002); Curry v. Menard, Inc., 270 F.3d 473, 477-78 (7th Cir. 2001)).

With regard to the fourth element of the prima facie case, Hubbard must show that Tyco "sought someone of roughly equivalent qualifications to perform substantially the same work." Aly, 711 F.3d at 46.  While there is significant leeway allowed in terms of how a plaintiff may make the requisite showing, see Rodriguez-Torres, 399 F.3d at 59, it is nonetheless essential to the prima facie case because only a discharge in the face of the employer's continuing need for the services provided by the discharged employee can raise an inference that the discharge was motivated by discriminatory animus, see Loeb v. Textron, Inc., 600 F.2d 1003, 1013 (1st Cir. 1979).  In response to Tyco's argument that he has not established the

fourth element of his prima facie case, Hubbard contends that
"the Defendant [does not] dispute that the inspections Mr.
Hubbard was conducting continued to be performed by others,"
Pl.'s Supp. Mem. of Law (doc. no. 56) 19-20, and he cites two
pages of Tyco's memorandum of law as evidence of Tyco's
concession on that point.

There are two problems with Hubbard's position.  First, it
is Hubbard's burden to establish his prima facie case, and he
identifies no record support for his contention that his work
continued to be performed by others after his discharge.
Second, the two pages of Tyco's memorandum that Hubbard cites
do not mention what happened to his duties after he was
discharged, and do not include a concession that Hubbard has
established the fourth element of his prima facie case.

So, it is far from clear that Hubbard has shown that Tyco
"sought someone of roughly equivalent qualifications to perform
substantially the same work," Aly, 711 F.3d at 46, after it
terminated his employment.  Because the burden of establishing
a prima facie case is light, see Martinez-Burgos, 656 F.3d at
12, however, the court will presume that Hubbard has
established all four elements of his prima facie case.

Turning to the second step of the McDonnell Douglas
framework, Tyco contends that Hubbard's communication with Long

on February 6, in violation of various directives not to talk with other employees about matters under investigation, was a legitimate nondiscriminatory reason for his discharge.  Indeed, the First Circuit has "often found [that] insubordination is obviously sufficient to support an adverse employment action." Pearson, 723 F.3d at 41 (citing Windross v. Barton Protective Servs., Inc., 586 F.3d 98, 104 (1st Cir. 2009)).

Hubbard, however, contends that insubordination was not a legitimate reason for his discharge.  He begins by asserting that the "gag order" on which Tyco based its charge of insubordination violated the National Labor Relations Act ("NLRA").  He then argues that "[a]n unlawful reason for terminating an employee is not 'legitimate' and therefore does not shift the burden of production back to the Plaintiff." Pl.'s Supp. Mem. of Law (doc. no. 56) 25.

Hubbard is mistaken in his expansive view illegitimacy.  At the second stage of the McDonnell Douglas framework, an employer's reason for discharging an employee "must be 'legitimate' or 'nondiscriminatory,' which means only that it is not a motive that is illegal under Title VII."  1 Rodney A. Smolla, Federal Civil Rights Acts § 9:40, at 1260 (3d ed. 2013) (emphasis added).  That is, "[c]ourts . . . limit their inquiry regarding an employer's proffered reason to whether that reason

35

is consistent with the statute at issue [and] do not

automatically determine that a decision based on a trait

protected by one statute is an illegitimate decision under a

statute that protects other traits."  1 Barbara T. Lindemann &

Paul Grossman, Employment Discrimination Law 39 (4th ed. 2007)

(emphasis in the original).  As the Supreme Court has explained:

> Although some language in our prior decisions might be
> read to mean that an employer violates the ADEA
> whenever its reason for firing an employee is improper
> in any respect, see McDonnell Douglas Corp. v. Green,
> 411 U.S. 792, 802 (1973) (creating proof framework
> applicable to ADEA) (employer must have "legitimate,
> nondiscriminatory reason" for action against
> employee), this reading is obviously incorrect.  For
> example, it cannot be true that an employer who fires
> an older black worker because the worker is black
> thereby violates the ADEA.  The employee's race is an
> improper reason, but it is improper under Title VII,
> not the ADEA.

Hazen Paper Co. v. Biggins, 507 U.S. 604, 612–13 (1993)

(parallel citations omitted); see also 1 Lex K. Larson,

Employment Discrimination § 12.09[2], at 12–81 to 12–82 (2d ed.

2012) ("[a]lthough discharge of an employee due to medical

reasons may run afoul of other statutes, such employer action is

not a Title VII violation if done with an even hand") (citing

Hervey v. City of Little Rock, 787 F.2d 1223 (8th Cir. 1986)).

Hazen is dispositive of Hubbard's argument; even if Tyco's "gag

order" violated the NLRA, that would not have made Tyco's reason

for terminating Hubbard's employment illegitimate in the context of a claim under Title VII or RSA 354-A:7.

Having presumed that Hubbard has established his prima facie case, and having determined that Tyco's charge of insubordination was a legitimate nondiscriminatory reason for terminating Hubbard's employment, the court turns to the third step in the McDonnell Douglas framework.  The court of appeals for this circuit has recently outlined the principles that govern pretext analysis under McDonnell Douglas:

> If the defendant proffers legitimate reasons for the adverse action, the plaintiff must then prove by a preponderance that the proffered reasons by the defendant are a pretext for unlawful discrimination. [St. Mary's Honor Ctr., 509 U.S.] at 507-08.  To meet his or her burden, a plaintiff must demonstrate either that the adverse employment action was (1) "more likely motivated" by discrimination than by the explanation proffered by the defendant; or (2) "the proffered explanation [was] unworthy of credence" where the suspect action, coupled with evidence to the contrary, suggests a discriminatory motivation. Burdine, 450 U.S. at 256.

Aly, 711 F.3d at 46 (parallel citations omitted).  Regarding the way in which courts should approach the issue of pretext, the court of appeals has explained:

> "[T]here is no mechanical formula for finding pretext."  Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 39 (1st Cir. 2003) (internal quotation marks omitted).  Instead, "[i]t is the type of inquiry where 'everything depends on the individual facts.'"  Id. at 40 (quoting Thomas v. Eastman Kodak Co., 183 F.3d 38, 57 (1st Cir. 1999)).  The inquiry focuses on whether the employer truly believed its stated reason for

taking action adverse to the employee.  See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 7 (1st Cir. 2000).  The plaintiff bears "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (alteration in original) (internal quotation mark omitted).

Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 116 (1st Cir. 2013) (parallel citations omitted).[4]  In other words, when "assessing whether an adverse employment decision is pretextual, [a court] do[es] not sit as a super-personnel department that reexamines an entity's business decisions." Espinal, 693 F.3d at 35 (quoting Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002); citing Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)) (internal quotation marks omitted). Rather, the court's task "is limited to determining whether the employer 'believe[d] in the accuracy of the reason given for the adverse employment action.'" Espinal, 693 F.3d at 35 (quoting Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 76 (1st Cir. 2008); citing Feliciano de la Cruz, 218 F.3d at 7).

---

[4] Kelley involved a retaliation claim brought under the Americans With Disabilities Act, see 707 F.3d at 115, but given that "[a] retaliation claim under the ADA is analyzed under the familiar burden-shifting framework drawn from cases arising under Title VII," id. (citations omitted), and given the Kelley court's citation of a discrimination case in its discussion of pretext analysis, see id. at 116, the legal principles stated in that discussion apply to this court's analysis of Hubbard's Title VII discrimination claim.

Hubbard's discrimination claim fails because he has not carried his burden with regard to either of the two inquiries described in <u>Aly</u>.  The court turns to each, in turn.

The first way for a plaintiff to establish pretext, under Aly, is to "demonstrate . . . that the adverse employment action was . . . more likely motivated by discrimination than by the explanation proffered by the defendant."  711 F.3d at 46 (internal quotation marks omitted).  The problem here is that Hubbard has produced <u>no</u> evidence that the decision to discharge him was motivated by discrimination.  He has produced evidence that the decision to discharge him was made by an executive council composed of Jonathan Dufour, Wilford Roy, DeRoy, Murphy, John Sewell, and an unnamed finance manager.  At oral argument, Hubbard conceded that none of those six decisionmakers ever said anything that demonstrated animosity toward people of English origin or toward non-Americans.  His best shot at establishing discriminatory animus is a theory he raised for the first time at oral argument, without the benefit of any legal authority. That theory is that the animus of the executive council is established by proof that the council somehow "condoned" national-origin discrimination directed against him by other

Tyco employees.  Because that argument is both legally and
factually unsupported,[5] it does not help Hubbard.

Hubbard correctly argues that he is entitled to support his
pretext argument with evidence he produced to establish his
prima facie case, see St. Mary's Honor Ctr., 509 U.S. at 511;
Espinal, 693 F.3d at 35, but that rule does him no good, because
he supported his prima facie case with no evidence of
discriminatory animus on the part of those who made the decision
to terminate his employment.

In his supplemented memorandum of law, Hubbard makes the
following argument, presumably directed to the prima facie case
that the decision to discharge him was a product of national-
origin discrimination:

> There is no dispute that discrimination was
> rampant at Tyco.  Once Deroy looked into the issues
> raised by Hubbard, he discovered that the harassing
> and discriminatory language and behavior were not
> being reported by management to Human resources.
> Specifically, the management team of Roy, Williams,
> Pixley and Coughlin.  There is also no dispute that
> Hubbard was harassed at work and was consistently
> asking for help.  He even considered transferring to
> get out of the situation.  The Defendant argues that
> the obvious and well documented animus was directed at
> Hubbard because he was an inspector, not because of
> his national origin.  The Defendant asks the Court to

---

[5] Moreover, it is difficult to square Hubbard's argument
that Tyco managers condoned discrimination against him with his
own statement of material facts, in which he describes
punishments meted out to both Derek Thompkins and Bill Rogers as
a result of their abusive behavior toward him, see Pl.'s Supp.
Mem. of Law (doc. no. 56) ¶¶ 10-14 (Thompkins), 27-29 (Rogers).

> make this factual finding despite the Defendant's
> admission that many others were discriminated against
> because of their race or national origin.  The
> motivation of the individuals harassing Hubbard is a
> classic instance [of a] genuine issue of material fact
> and defeats summary judgment.

Pl.'s Supp. Mem. of Law (doc. no. 56) 20 (citations to the
record omitted).  It is, indeed, well established that "courts
should exercise particular caution before granting summary
judgment for employers on such issues as pretext, motive, and
intent."  Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d
128, 140 (1st Cir. 2012)) (quoting Santiago-Ramos v. Centennial
P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000); citing
Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir.
1998)); see also Kelley, 707 F.3d at 115-16 (citations omitted).
Even so, the evidence Hubbard has produced goes to the animus of
his co-workers and subordinates, not to the animus of those on
the executive council who were responsible for making the
decision to discharge him.  In sum, because Hubbard has produced
no evidence of anti-English animus on the part of those who made
the decision to discharge him, he has not demonstrated that his
discharge was motivated by discrimination at all, much less that
it was "more likely motivated by discrimination," Aly, 711 F.3d
at 46, than by the decisionmakers' belief that he had violated
one or more direct instructions from management in his
communications with Long on February 6.

Hubbard is equally unable to establish pretext under the alternative path described in Aly, that is, by "demonstrate[ing] . . . that the . . . proffered explanation [was] unworthy of credence where the suspect action, coupled with evidence to the contrary, suggests a discriminatory motivation," 711 F.3d at 46 (internal quotation marks omitted).  "Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination." Acevedo-Parrilla, 696 F.3d at 141 (quoting Williams v. Raytheon Co., 220 F.3d 16, 19 (1st Cir. 2000); citing Reeves, 530 U.S. at 147).  That is so because demonstrating that an employer's explanation is unworthy credence goes directly to the central focus of the pretext analysis, i.e., "whether the employer believed its stated reason to be credible," Acevedo-Parrilla, 696 F.3d at 142 (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991); citing Gray v. N.E. Tel. & Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986); Feliciano de la Cruz, 218 F.3d at 7); see also Kelley, 707 F.3d at 116.

An explanation is unworthy of credence when is suffers from "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . .' such that a factfinder could 'infer that the employer did not act for the asserted non-

discriminatory reasons.'" Santiago-Ramos, 217 F.3d at 56
(quoting Hodgens, 144 F.3d at 168).  While recognizing that
"courts should exercise particular caution before granting
summary judgment for employers on such issues as pretext,
motive, and intent," Acevedo-Parrilla, 696 F.3d at 140
(citations omitted), the court nevertheless concludes that
Hubbard has not produced evidence on the believability of Tyco's
reason for discharging him from which a reasonable jury could
determine that that reason was a pretext.

All agree that Tyco's proffered reason for discharging
Hubbard was insubordination, based upon his February 6
communications with Long.  That reason is not unworthy of
credence.  It is undisputed that: (1) in December of 2008,
Hubbard was issued a Warning prohibiting him from spreading
information concerning ongoing investigation with fellow
employees because such "behavior creates animosity with fellow
employees," Vanderzanden Aff., Ex. 7 (doc. no. 34-7), at 2; (2)
that Warning was in force until June of 2009; (3) on February 5,
DeRoy and Murphy told Hubbard about Long's February 5 statement
complaining about Hubbard's approaching him to talk about work-
related issues, and asked Hubbard to respond to the issues
raised in that statement; (4) on February 6, DeRoy spoke with
Hubbard about his relationship with Long, and told him he didn't

"want . . . for any pot to be stirred," Pl.'s Mem. of Law, Ex. 3, Hubbard Dep. (doc. no. 39-4) 109:14; (5) later that day, and after his meeting with DeRoy, Hubbard engaged in a conversation with Long in which he complained about Long having "the nerve to fucking lie" about him in statements to Tyco officials, id., Ex. 9 (doc. no. 34-9), at 2; and (6) Long was so upset by his conversation with Hubbard that he immediately contacted his supervisor to report it.

Given those undisputed facts, the court concludes, as a matter of law, that Tyco's explanation for terminating Hubbard, insubordination, is not unworthy of credence.  That is, Hubbard has produced no evidence that would allow a reasonable factfinder to "infer that [Tyco] did not act for the asserted non-discriminatory reasons."  Santiago-Ramos, 217 F.3d at 56 (citation omitted).

Even if Hubbard could demonstrate that insubordination is not a credible explanation for Tyco's decision to discharge him, the record is completely devoid of any evidence that suggests a discriminatory motivation on the part of the executive council, for the reasons stated above.

 As with the discrimination claim based upon his suspension, Hubbard appears to argue that the pretextual nature of Tyco's explanation for his discharge is demonstrated by the

disparate treatment he received.  Specifically, he argues that
Tyco's explanation is a pretext for national-origin
discrimination because he was discharged for violating
instructions not to communicate with Long while Bill Rogers, an
American, violated Tyco's Guide to Ethical Conduct ("GEC")
and/or its Harassment Free Workplace Policy ("HFW Policy") five
times without being discharged, notwithstanding Tyco's policy of
discharging an employee upon his or her second violation of the
HFW Policy.  By Hubbard's own admission, this example of
purported disparate treatment is "not as identical as the
[Thompkins/Joslin] example."  Pl.'s Supp. Mem. of Law (doc. no.
56) 28.  The court agrees.

 Hubbard was discharged for talking with Long about matters
he, Hubbard, had been discussing with management.  That conduct
took place in early February.  Less than two months before that,
in late December, Hubbard had been suspended for engaging in
identical conduct, and was under a formal Warning not to do so
again.  That Warning was reiterated hours before Hubbard
communicated with Long, when DeRoy told Hubbard that he did not
want the pot to be stirred.  According to Hubbard, Rogers
violated Tyco's GEC and/or its HFW Policy five times between
January of 2008 and April of 2009, but was not discharged for

any of those violations, notwithstanding Tyco's policy of discharging an employee after a second violation.

While the court understands Hubbard's unhappiness with Tyco's apparent leniency toward Rogers' violations of the GEC and/or the HFW Policy, Rogers is not a valid comparator. Hubbard was discharged for insubordination, but he does not claim that Rogers was ever insubordinate.  If some other employee had been allowed to keep his or her job after engaging in hostile communications with another employee, hours after being directed not to stir the pot, and had done so while under a Warning not to discuss ongoing company investigations with other employees, then Hubbard might have a good argument.  But here, even if Hubbard is able to prove that Tyco did not follow its own internal guidelines with respect to disciplining Rogers, Hubbard's conduct and Rogers' conduct are so different that Rogers is not a valid comparator for purposes of establishing pretext based upon disparate treatment.

Hubbard also argues that pretext is shown by the fact that he was suspended pending Tyco's investigation of his communications with Long, while Long was not, and the fact that he was discharged as a result of those communications, and Long was not.  In Hubbard's view, he and Long engaged in exactly the same conduct, but Tyco treated them differently.  Long, however,

is not a valid comparator for at least three reasons.  First, on February 6, Long was not operating under a Warning for having inappropriate communications with coworkers.  Second, at the time of the communications between Hubbard and Long, Long had not been warned against stirring the pot, and Hubbard has identified no reason why he should have been.  And third, in the communications at issue, Hubbard was aggressive and abusive, while Long was not.  So, like Rogers, Long is not a valid comparator.  Because neither Rogers nor Long is a valid comparator, Hubbard has failed to produce evidence on disparate treatment from which a reasonable jury could determine that the reason Tyco gave for discharging him was pretextual.

Finally, taking a step back from formal legal analysis, Count IV also founders when viewed from the perspective of basic common sense.  Tyco hired Hubbard despite the fact that he is English.  Thereafter, according to Hubbard himself, he became "the fastest guy in the company's history ever to go in there and became a T3 to T1," Def.'s Facts (doc. no. 32) ¶ 13 (quoting Def.'s Mem. of Law, Ex. D, Hubbard Dep. (doc. no. 32-4) 64:13-14).  It defies both logic and the undisputed facts of this case to argue that the same company that hired Hubbard and rapidly promoted him, while knowing him to be English, then discharged him because of his national origin.  See LeBlanc, 6 F.3d at 847

("LeBlanc points to nothing in the record to suggest why Conte, who, in January 1989, approved LeBlanc's transfer, at Great American's expense . . . and his corresponding sixteen percent pay raise, would develop an aversion to older people less than two years later . . . ."); Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991) ("From the standpoint of the putative discriminator, '[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.'" (quoting Donohue & Siegelman, The Changing Nature of Employment Discrimination Litigation, 43 Stan. L. Rev. 983, 1017 (1991)).

To conclude, Hubbard has established that he is English and that Tyco discharged him, but he has come nowhere close to producing evidence that would allow a reasonable jury to conclude that the reason Tyco gave for discharging him was a pretext for national-origin discrimination. As a result, his discrimination claim fails at stage three of the McDonnell Douglas framework. Accordingly, Tyco is entitled to judgment as a matter of law on the discrimination claim stated in Count IV.

3. Retaliation (Counts V and VI)

In the fact section of his complaint, Hubbard alleged that he reported incidents of workplace discrimination to his

superiors on two occasions in September of 2008, see Compl.
(doc. no. 1) ¶¶ 19 & 20, and did so on three more occasions, in
November and December of 2008, see id. ¶¶ 21 & 22, and again at
some point after he returned from his late-December suspension,
see id. ¶ 24.

In his complaint, Hubbard asserted his state-law
retaliation claim in the following way:

> As more particularly described above, immediately
> upon the heels of the Plaintiff telling the Defendant
> that he was being discriminated against based on his
> national origin, the Defendant began a pattern of
> retaliatory conduct toward the Plaintiff as described
> herein.
>
> The culmination of the retaliation was that the
> Plaintiff was terminated.
>
> The Defendant's unlawful retaliation against the
> Plaintiff for reporting discrimination based on
> national origin violates N.H. RSA 354-A:7, I.

Compl. (doc. no. 1) ¶¶ 48-50.  He asserted his federal
retaliation claim in a similar fashion:

> As more particularly described . . . above, the
> defendant has likewise willfully violated Title VII,
> 42 U.S.C. Section 2000(e) et seq. by retaliating
> against the Plaintiff for complaining about
> discrimination based on his national origin and then
> engaging in a pattern of retaliatory conduct toward
> him, culminating in termination.

Id. ¶ 53.  While both of Hubbard's claims refer to "a pattern of
retaliatory conduct," the fact section of his complaint
identifies no potentially retaliatory adverse employment action

other than his discharge, and it does not indicate what other
actions by Tyco contributed to the pattern of conduct to which
he refers.

In his supplemented memorandum of law, Hubbard appears to
assert, seemingly in passing, two additional theories of
retaliation.  First, in his argument that Tyco's reason for
discharging him was not legitimate, Hubbard appears to suggest
that if he was discharged for his February 6 communications with
Long, that would have been an act of retaliation in violation of
Title VII.  See doc. no. 56, at 25.  If, indeed, Hubbard is
making such a claim, the court is quite confident that Hubbard's
communications with Long do not qualify as protected conduct for
the purpose of a Title VII retaliation claim.  In addition, in
the section of his supplemented memorandum actually devoted to
retaliation, Hubbard concludes this way:

> In this case, Plaintiff complained repeatedly to
> his supervisors and directors.  No action was taken
> until Coughlin claimed that Hubbard was seeking legal
> assistance.  Within seven days of that report by
> Coughlin, Hubbard was terminated.

Pl.'s Supp. Mem. of Law (doc. no. 56) 36.  Based upon the
foregoing, the court assumes that: (1) Hubbard is now claiming
that he was discharged because relevant Tyco decisonmakers
believed that he had either considered retaining counsel or had
actually done so, despite the lack of any support for such a

claim in the factual allegations he made in his complaint; and
(2) such an action by Tyco would violate Title VII, despite the
lack of any legal authority for that proposition in Hubbard's
supplemented memorandum of law.  However, adding Hubbard's new
claim to the one actually stated in his complaint does him no
good because that claim fails just as his original claim fails,
due to his failure to establish that his discharge was causally
related to his purported protected conduct.

Count V arises under RSA 354-A, while Count VI arises under
Title VII.  As with Counts III and IV, the court will conduct a
single analysis under the standard applicable to Title VII.  See
Hudson, 822 F. Supp. 2d at 92.  "Title VII makes it unlawful for
an employer to discriminate against an employee who has opposed
an unlawful employment practice."  Gerald, 707 F.3d at 24
(citing 42 U.S.C. § 2000e-3(a)).

In a recent Title VII retaliation case, the court of
appeals for this circuit outlined the applicable analytical
approach:

> Under the McDonnell Douglas framework, a
> plaintiff must first establish a prima facie case of
> retaliation by showing that (1) she engaged in
> protected conduct, (2) she was subject to an adverse
> employment action, and (3) a causal connection existed
> between the first and second elements.  Noviello v.
> City of Boston, 398 F.3d 76, 88 (1st Cir. 2005).  The
> burden then shifts to the defendant to "articulate a
> legitimate, non-discriminatory reason for its
> challenged actions."  Provencher v. CVS Pharmacy, Div.

of Melville Corp., 145 F.3d 5, 10 (1st Cir. 1998)
(citing Texas Dep't of Cmty. Affairs v. Burdine, 450
U.S. 248, 254-55 (1981)).  Finally, "[i]f the
defendant does so, the ultimate burden falls on the
plaintiff to show that the proffered legitimate reason
is in fact a pretext and that the job action was the
result of the defendant's retaliatory animus."
Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535
(1st Cir. 1996).

Colón v. Tracey, 717 F.3d 43, 49 (1st Cir. 2013) (parallel

citations omitted).  The court then went on to note that "[a]s

the appropriate standard for causation in a Title VII employment

retaliation claim is not at issue here, we acknowledge but need

not address the Supreme Court's recent grant of certiorari in

University of Texas Southwestern Medical Center v. Nassar,"

Colón, 717 F.3d at 49 n.14.

        Shortly after the First Circuit decided Colón, the Supreme

Court decided Nassar.  In its decision, the Court ruled:

        Title VII retaliation claims must be proved according
        to traditional principles of but-for causation, not
        the lessened causation test stated in § 2000e-2(m).
        This requires proof that the unlawful retaliation
        would not have occurred in the absence of the alleged
        wrongful action or actions of the employer.

133 S. Ct. 2517, 2533 (2013); see also Torrech-Hernández v. Gen.

Elec. Co., 519 F.3d 41, 48 (1st Cir. 2008) (explaining, in ADEA

discrimination claim, that for factor to be "but for" cause of

employee's discharge, it must have been "the determinative

factor in his discharge") (quoting Dávila, 498 F.3d at 15;

citing Mesnick, 950 F.2d at 823) (emphasis added).  That is a

more demanding causation standard than the one that applies to
Title VII discrimination claims, under which a plaintiff need
only establish that discriminatory animus was a motivating
factor for an adverse employment action.  See Nassar, 133 S. Ct.
at 2526, 2534.  Given the substantial difference between
motivating-factor causation and but-for causation, the court
cannot agree with Hubbard that the Nassar decision has little or
no effect on the analysis of his retaliation claims.

However, it is not entirely clear where the analysis of
causation fits into the McDonnell Douglas framework as applied
to Title VII retaliation claims.  As Colón describes that
framework, it appears that causation must be considered: (1) at
stage one of the McDonnell Douglas framework, as the third
element of the prima facie case; and (2) at stage three, as a
part of the plaintiff's ultimate burden.  The court will assume
without deciding that Hubbard has produced adequate evidence to
establish his prima facie case, and move to the second and third
stages of the McDonnell Douglas framework.  For the reasons
given in the previous section, Tyco has met its burden of
producing evidence of a legitimate nondiscriminatory reason for
its decision to discharge Hubbard.  That leaves the third stage
of the framework.

While the court of appeals for this circuit has yet to decide a Title VII case that involves an application of Nassar, useful guidance on how Nassar might be applied to the third stage of a McDonnell Douglas analysis may be derived from the First Circuit's opinion in McArdle v. Town of Dracut/Dracut Public Schools, 732 F.3d 29 (1st Cir. 2013). In that case, the plaintiff asserted a retaliation claim under section 105(a)(1) of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2615(a)(1). The court described the elements of McArdle's claim:

> "To make out a prima facie case of retaliation [McArdle] must show (1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." [Hodgens v. Gen. Dynamics Corp., 144 F.3d 151,] 161 [1st Cir. 1998)] (applying the standard from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to FMLA cases).

732 F.3d at 35 (parallel citations omitted). In McArdle, the employee claimed that he was discharged "because he asked for FMLA leave." Id. The court of appeals, however, determined that "he was fired because the town concluded that his renewed and indefinite absence [from work], without advance notice, allowed it to fire him." Id. The court continued:

> The correctness of this conclusion is underscored by imagining that McArdle had made no request at all for FMLA leave. In such a scenario, the town's claim

54

that he was abandoning his job without effectively
establishing a right to do so would have been
indisputably correct.  He would have been terminated,
perhaps sooner.  Alternatively, imagine that McArdle
had asked for FMLA leave while still showing up for
work.  There is no evidence to which he points that
would support any inference that the town would have
still fired him, or even thought that it could fire
him under the terms of the collective bargaining
agreement.  In short, even assuming that he properly
requested FMLA leave that request could not have
caused his termination.  His absence from work, on the
other hand, was fully sufficient to cause his
termination.  Cf. Soto-Padro v. Pub. Bldgs. Auth., 675
F.3d 1, 6 (1st Cir. 2012) ("'if the lawful reason
alone would have sufficed to justify the [action],'
'[t]hen the employee cannot prevail.[']") (quoting
McKennon v. Nashville Banner Pub. Co., 513 U.S. 352,
359 (1995)).  This conclusion "comports with the
traditional tort-law principle that if the wrongful
act did not cause the injury, the wrongdoer is not
liable."  Tejada-Batista v. Morales, 424 F.3d 97, 101
(1st Cir. 2005).

McArdle, 732 F.3d at 36 (parallel citations omitted).

The application of McArdle to the facts of this case is

straightforward.  If Hubbard had not reported discrimination to

Tyco, Tyco's claim that Hubbard had acted insubordinately by

contacting Long would have been indisputably correct, for

reasons developed in the previous section.  On the other hand,

if Hubbard had complained about discrimination but not contacted

Long on February 6, "[t]here is no evidence . . . that would

support any inference that [Tyco] would have still fired him,"

732 F.3d at 36.  To the contrary, Hubbard himself asserts that

he had complained about discrimination at Tyco for months prior

to the February 6 incident, without suffering any adverse
employment action or being given any reason to believe that such
adverse actions might result from such conduct on his part.
Rather, it is undisputed that Tyco's response to Hubbard's
protected conduct was to begin an investigation, albeit not as
quickly as Hubbard might have liked.  In short, because
Hubbard's contact with Long, alone, gave Tyco a credible reason
for discharging him, Hubbard cannot establish that but for his
protected conduct he would not have been discharged.

Hubbard's only argument on causation is that the requisite
causal link between his protected conduct and his discharge is
the short span of time between his meeting with DeRoy and Murphy
on February 4 and his discharge on February 12.  It is well
established that "[t]emporal proximity alone can suffice to meet
the relatively light burden of establishing a prima facie case
of retaliation." Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d
19, 32 (1st Cir. 2011) (quoting DeCaire v. Mukasey, 530 F.3d 1,
19 (1st Cir. 2008); citing Collazo v. Bristol-Myers Squibb Mfg.,
Inc., 671 F.3d 39, 49-50 (1st Cir. 2010); Mariani-Colón v. Dep't
of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007)); see also
Gerald, 707 F.3d at 25 (citing Harrington v. Agg. Indus. Ne.
Region, Inc., 668 F.3d 15, 32 (1st Cir. 2012)).  Temporal
proximity, alone, however, is insufficient to establish

causation at the third stage of the McDonnell Douglas framework.
See Alvarado, 687 F.3d at 464 (accepting one-week interval
between protected conduct as sufficient to establish third
element of prima facie case, but insufficient to establish
causation at stage three of McDonnell Douglas framework) (citing
Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003);
Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir.
1997)).

    Absent any evidence of causation other than temporal
proximity, Hubbard has failed to produce evidence sufficient to
send his retaliation claim to a jury.  Accordingly, Tyco is
entitled to judgment as a matter of law on the claims stated in
Counts V and VI.

### Conclusion

    As the court explained at the outset of this order, Tyco's
motion to strike, document no. 57, is denied as moot, and
Hubbard's motion to correct the record, document no. 65, is
granted.  For the reasons detailed above, Tyco is entitled to
judgment as a matter of law on Hubbard's discrimination and
retaliation claims, but not the hostile-work-environment claims
stated in Counts II and III.  Thus, Tyco's motion for summary
judgment, document no. 30, is granted in part and denied in
part; the case remains on track for a trial on Counts II and

III.  The court concludes by noting that the elimination of Counts IV, V, and VI from this case may provide a good opportunity for mediation of the two claims that remain.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge

December 3, 2013

cc:   Nicole S. Corvini, Esq.
      Lisa Hall, esq.
      Michael S. McGrath, Esq.
      Danielle Y. Vanderzanden, Esq.