Hubbard, Greg

Kincaid Vocational & Rehabilitation Services
One University Plaza, Suite 8, Hackensack, NJ 07601
201.343.0700   201.343.0757 fax



Kincaid | VOCATIONAL EVALUATION FOR LITIGATION℠

## VOCATIONAL EVALUATION, EARNING CAPACITY & MITIGATION ANALYSIS

**PREPARED BY:**    Charles A. Kincaid, Ph.D., CRC, CVE, ATP, CLCP
Licensed Rehabilitation Counselor (NJ License #: RC00042)
One University Plaza ~ Suite 510
Hackensack, New Jersey 07601
Phone:  (201) 343-0700
Fax:     (201) 343-0757

**PREPARED FOR:**    Danielle Vanderzanden, Esquire
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
One Boston Plaza, Suite 3220
Boston, Massachusetts, 02108
Phone: (617) 994-5724
Fax:     (617) 994-5701

**REGARDING:**    Greg Hubbard

**DATE OF BIRTH:**    June 5, 1979

**REPORT DATE:**    April 22, 2013

### REFERRAL INFORMATION

Mr. Greg Hubbard's case was referred for Vocational Assessment and determination as to whether or not, as a result of events alleged in the law suit titled Greg Hubbard against, Tyco Integrated Cable Systems, Inc. (Tyco), he incurred a vocational impairment or work disability and if so, how such alleged impairment or disability affected his earning capacity.  In addition, determination was made with regard to the reasonableness of Mr. Hubbard's attempts to mitigate loss of earnings and to determine the magnitude of his lost wages damage.  A vocational Evaluation was conducted, based upon evaluation of pertinent information provided regarding Mr. Hubbard's age, education, past relevant employment and earnings history, and current employment and earnings.  The information gathered pertains to the relevant vocational factors for Mr. Hubbard in relation to the competitive employment market.

Hubbard, Greg

## CERTIFICATION

This is to certify that I am not related to any of the parties to subject action, nor do I have any present or intended financial interest in the outcome of this case beyond the fees due for professional services rendered in connection with this report and possible subsequent services.  Further, I certify that my professional fees are not contingent upon the resultant financial awarding of this matter, but are based on the time expended on the services provided to counsel in connection with the subject action.

This is to further certify that all assumptions, methodologies and calculations utilized in this evaluation and assessment report are based on current knowledge and methods applied in the determination of employability, labor market access, job placement and earnings capacity.

Duly noted are the professional committees to whose code of ethics I subscribe: The Commission on Rehabilitation Counselor Certification, International Association of Rehabilitation Professionals, Commission on Health Care Certification and the State of New Jersey, Professional Counselor Licensure Board.

My curriculum vitae, fee schedule and list of court and deposition testimony are attached as attachments 1-4 to this report.

## EVALUATION QUESTIONS

Vocational evaluations of individuals involved in employment law disputes address the extent to which alleged employment practices have adversely affected an individual's career development or earning capacity.  The following questions will be addressed in this evaluation:

1. Did Mr. Hubbard take reasonable steps to mitigate his alleged lost wages damages following his employment termination by Tyco?

2. What dollar value reflects the value of the alleged claim for lost wages damages after accounting for all relevant mitigation related factors?

## EVALUATION METHODOLOGY

Records and data regarding Mr. Hubbard were provided by the law offices of Ogletree, Deakins, Nash, Smoak & Steward for review and use in evaluating his employability and earning capacity.  It should be noted that Mr. Hubbard refused to be interviewed or respond to written questions for this evaluation.  The following procedures were followed:

2

Hubbard, Greg

1) Relevant background information was obtained with regard to Mr. Hubbard's age, education, present employment and earnings status, past employment and earnings experience and current work/life status.

2) The employment history was researched using standard vocational reference materials that are detailed in the Resources and References section at the end of this narrative. This employed the **McCroskey Transferable Skills Program**, a job-person matching system, which enables the comparison of individual abilities and job requirements to see where the two intersect. This system, which has been shown to have a high degree of reliability and validity, employs the U.S. Department of Labor (DOL) worker trait factor system as a means of comparing individual capacities against the mental and physical demands of jobs, as they exist in the local labor market. In addition, the **McCroskey Vocational Quotient System** was used to further analyze employability for Mr. Hubbard. Labor/market wage information was gathered for the New Hampshire area.

3) From the information generated and reviewed, a vocational profile of worker trait capacity levels was established and used to compare the pre-injury capacities of Mr. Hubbard against the demands of jobs, as they exist in the competitive local labor market. Educational attainment level and vocational preparation were also considered.

4) Predicated upon jobs matching Mr. Hubbard's vocational profile, labor market demand and wages for these jobs were researched for the labor market area noted, as well as worker requirements.

5) From this information, further analysis was done to ascertain how the alleged wrongful termination from employment at Tyco has affected Mr. Hubbard's employability, labor market access, job placement potential, and wage earning capacity at this time.

## INFORMATION AND DOCUMENTS REVIEWED

1. Interrogatories to Plaintiff Greg Hubbard: Greg Hubbard, Plaintiff, against, Tyco Integrated Cable Systems, Inc., Defendant. United States District Court for the District of New Hampshire. C.A. No. 1:10-cv-00365-LM. Dated: New Hampshire; May 31, 2011.

2. Deposition of Greg Hubbard Volume 1: Greg Hubbard, Plaintiff, against, Tyco Integrated Cable Systems, Inc., Defendant. United States District Court for the District of New Hampshire. C.A. No. 1:10-cv-00365-LM. Dated: New Hampshire; June 8, 2012.

3

Hubbard, Greg

3. <u>Stipulation of Plaintiff Greg Hubbard:</u> Greg Hubbard, Plaintiff, against, Tyco Integrated Cable Systems, INC., Defendant. United States District Court for the District of New Hampshire. C.A. No. 1:10-cv-00365-LM. Dated: July 2, 2012.

4. <u>Continued Deposition of Greg Hubbard:</u> Greg Hubbard, Plaintiff, against, Tyco Integrated Cable Systems, INC., Defendant. United States District Court for the District of New Hampshire. C.A. No. 1:10-cv-00365-LM. Dated: New Hampshire; July 20, 2012.

5. <u>Deposition of Thomas Ward, M.D.:</u> Greg Hubbard, Plaintiff, against, Tyco Integrated Cable Systems, INC., Defendant. United States District Court for the District of New Hampshire. C.A. No. 1:10-cv-00365-LM. Dated: New Hampshire; July 27, 2012.

6. <u>Deposition of Bert Fichman, M.D.:</u> Greg Hubbard, Plaintiff, against, Tyco Integrated Cable Systems, INC., Defendant. United States District Court for the District of New Hampshire. C.A. No. 1:10-cv-00365-LM. Dated: New Hampshire; July 27, 2012.

7. Tyco Electronics Employee Handbook.

8. Correspondence, statements, E-Mail's from inside Tyco Electronics.

9. Charge of Discrimination Documents.

10. Job Description Tradesperson Class 3.

11. Functional Capacity Evaluation by. J. Samson.

12. Individual Income Tax Returns and W-2 Wage and Tax Statements 2006-2010.

13. Estimate of Economic Loss prepared by Catherine S. Newick Dated: January 26, 2012.

14. Tyco - Earnings Statements for Mr. Hubbard

15. Records produced by the Social Security Administration.

## EDUCATIONAL/MILITARY BACKGROUND

Mr. Hubbard indicated that he earned a high school diploma at Harold Hill Senior High School located in Rumford Essex, UK.  He attended for less than one year at Barking College located in London, UK.  Other than on-the-job training, no other training or education is noted.

Hubbard, Greg

## FAMILY/SOCIAL

Mr. Hubbard is married to Sarah Hubbard and the father of four, Asia, born in 1999, Ocean, born in 2003, Skylar, born in 2004 and London born in 2010.  He currently resides at 19 Shaw Drive located in Rochester, New Hampshire.  Mr. Hubbard has a New Hampshire State Automobile driver's license.

## EMPLOYMENT EXPERIENCE

Mr. Hubbard was employed at Tyco from September 17, 2007 to February 12, 2009 as a Senior Quality Analyst in the New Hampshire State area.  His employment was terminated on February 12, 2009.  He temporarily returned to work at Wolf's Tavern from May 2010 to August 2010.  Based on a 2004, non-Tyco related injury, Mr. Hubbard has applied for and is receiving Social Security Disability Income benefits effective April 1, 2011.  He stopped any effort to seek work in 2010.  Mr. Hubbard is not currently working or seeking work.  His past work experience includes Waiter, Kitchen Worker, Senior Quality Analyst, Manager and Waiter job positions.  Mr. Hubbard's employment experience, as found in the sources identified above is as follows:

| | |
|---|---|
| **Position:** | **Waiter/Kitchen Worker** |
| Employer: | Wolf's Tavern |
| Location: | Wolfeboro, New Hampshire |
| Dates: | May 2010 – August 2010 |
| Duties: | Waiter and Kitchen Worker duties. |

| | |
|---|---|
| **Position:** | **Senior Quality Analyst** |
| Employer: | Tyco |
| Location: | New Hampshire |
| Dates: | September 2007 – February 2009 |
| Earnings: | $20.63 per hour plus differential |
| Duties: | Typical Senior Quality Analyst duties. |

| | |
|---|---|
| **Position:** | **Manager/Supervisor** |
| Employer: | Welding and Steel Fabrication |
| Location: | North Carolina |
| Dates: | 2002 – 2004 |
| Duties: | Typical Manager/Supervisor duties for a Welding and Steel Fabrication facility. |

| | |
|---|---|
| **Position:** | **Waiter** |
| Employer: | Seafood Restaurant |
| Dates: | 1999 – 2001 |
| Duties: | Typical Server duties. |

5

Hubbard, Greg

## ANALYSIS OF THE EDUCATION AND EMPLOYMENT EXPERIENCE

The jobs Mr. Hubbard has successfully performed were researched in the U.S. Department of Labor's **Dictionary of Occupational Titles**, along with addendum publications that include the **Revised Handbook for Analyzing Jobs**, the **O'Net Dictionary of Occupational Titles**, the **Encyclopedia of Job Requirements**, and **Occupational Outlook Handbook**. Reference to these job titles is important, as they have known capacity statements attached to them, which represent modal ability levels associated with the types of jobs Mr. Hubbard has performed in the past.

| DOT Number | DOT Title | VQ | Skill Level – Specific Vocational Preparation[1] | Physical Demands |
|---|---|---|---|---|
| 168.287-014 | Inspector, Quality Assurance | 127.4 | SVP = 7 (Skilled) | Light |
| 311.477-030 | Waiter, Informal | 97.58 | SVP = 3 (Semi-Skilled) | Light |
| 619.381-010 | Inspector | 108.4 | SVP = 6 (Skilled) | Light |

This job requires a Light physical duty on a five point scale (sedentary, light, medium, heavy and very heavy).

According to the **Dictionary of Occupational Titles**, light work is defined as:

> "Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may only be negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree: or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when a job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible."

| Code | Aptitude | Level |
|---|---|---|
| R | Reasoning | High Average |
| M | Mathematics | High Average |
| L | Language | High Average |
| S | Spatial Perception | Low Middle Average |
| P | Form Perception | High Middle Average |
| Q | Clerical Perception | Low Middle Average |
| K | Motor Coordination | Low Middle Average |
| F | Finger Dexterity | Low Middle Average |
| M | Manual Dexterity | Low Middle Average |
| E | Eye Hand Foot Coordination | Below Average |
| C | Color Discrimination | Low Middle Average |

---

[1] SVP 1 = <5 Days,  SVP 2 = 5-30 Days,  SVP 3 = 1-3 Months,  SVP 4 = 3-6 Months,  SVP 5 = 6-12 Months
SVP 6 = 1-2 Years,  SVP 7 = 2-4 Years,  SVP 8 = 4-10 Years,  SVP 9 = >10 Years

Hubbard, Greg

These jobs are rated in the Above Average range on the **McCroskey Vocational Quotient Scale**, a standardized empirically-derived index of vocational difficulty that considers all of the worker traits that are measures of mental and physical **capacity** to derive an overall statistical index of job difficulty.  This index ranges from a low of approximately 72.00 to a high of about 154.00.  The VQ distribution for all jobs in the DOT has been transformed (McCroskey, 1992) to a Mean of 100.00 and a Standard Deviation 15.00.  In general, the higher the VQ, the more difficult and rewarding is the job.  Jobs with VQ's ranging between 85.00 and 115.00 fall within the "average range" of overall job difficulty.

## MEDICAL RECORDS REVIEWED

1. Rochester Hill Family Practice
   Shawn Roussin, P.A.
       Office Note: 02/07/09
   Stephanie Robillard, P.A.C.
       Office Note: 03/28/09
   Unspecified Practitioner
       Office Note: unspecified date
   Richard Cappello, D.O.
       Office Notes: 04/07/09, 04/28/09, 06/02/09, 07/07/09, 09/28/09, 09/29/09,
       10/20/09, 03/02/10, 03/23/10, 04/14/10, 06/07/10, 06/25/10, 06/29/10
       Letter of Medical Necessity: 04/14/10
       Letter: 07/06/10

2. Dartmouth-Hitchcock Medical Center
   Thomas Ward, M.D.
       Office Notes: 05/14/09, 05/18/09, 05/27/09, 06/24/09
   Bert Fichman, M.D.
       Office Note: 10/08/09

3. Frisbie Memorial Hospital
   Unspecified Practitioners
       Emergency Department Records: 05/05/08, 03/30/09, 09/27/09, 09/28/09,
       06/04/10, 06/24/10
   Albert Tu, MD.
       Imaging Report: 09/27/09
   Albert Chang, M.D.
       Imaging Report: 03/23/10
   Brian Szymanski, M.D.
       Imaging Report: 06/04/10
   Shannon Nedelka, M.D.
       Imaging Reports: 06/24/10, 05/29/11

4. Access Sports Medicine & Orthopaedics
   Christopher Wheeler, P.A.

7

Hubbard, Greg

      Evaluation: 07/13/10

5.  Walter Wrobleski, M.D.
      Evaluation: 10/11/10

6.  Jonathan Jaffe, M.D.
      Evaluation: 10/20/10

7.  Robert Prescott, Ph.D.
      Comprehensive Psychological Evaluation: 10/21/11

8.  Social Security Disability Records

## MEDICAL HISTORY SUMMARY

The records reviewed for this evaluation indicate that Mr. Hubbard was discharged from Tyco in February 2009 and that he believes he was the victim of employment discrimination because he is British.  He has a medical history, predating his employment with Tyco, of prior injuries to his head and knees from a motor vehicle accident in August 2004.  Mr. Hubbard repeatedly reported to his physicians that he used marijuana on a regular basis.   In April 2009, Mr. Hubbard was tested for drugs of abuse and tested positive on several subsequent occasions.  In 2010, he applied for Social Security Disability based on his 2004 injuries and was approved and awarded benefits effective on April 1, 2011.  A synopsis of the medical records is as follows:

On an unspecified date an unspecified practitioner visited with the patient.  (S)he assessed:

      Problems:
      1.  Internal derangement, left knee.
      2.  Depression.
      3.  Weight loss.
      4.  Internal derangement, knee NOS.
      5.  Headache.
      6.  Tobacco abuse.
      7.  Narcotic abuse.
      8.  Anxiety disorder.
      9.  Accident, traffic NOS …
      10. Vertigo.
      11. Insomnia.

On 04/07/09, Dr. Richard Capello ordered a urine screen to detect the use of drugs. The test results indicated that Mr. Hubbard tested positive for Cannbinoids.

On 05/14/09 Dr. Thomas Ward evaluated the patient.  He documented:

8

Hubbard, Greg

What happened is in the motor vehicle accident [of August 18, 2004] his vehicle apparently flipped over several times.  He was wearing his seatbelt, but it came loose.  He was ejected from the car and struck his head on a fire hydrant.  He had a concussion with a loss of consciousness for about three days and apparently a skull fracture and ended up having a craniotomy on the right.  He was treated in Greensboro, North Carolina.  He was hospitalized for about two weeks and then underwent an extensive period of rehabilitation, as he was quite disabled.  He was treated by Carolina Neurosurgery I believe.  He, since that time, has had a constant and unremitting headache, which has been present ever since he woke up from the injury.

Assessment:  Chronic posttraumatic hemicrania continua with aura.

On 09/27/09 Dr. Albert Tu reviewed images.  He opined:

Study:        Five views of the left knee.
Impression:  Unremarkable study.

On 10/08/09, Bert Fichman, M.D. ordered a urine screen to detect the use of drugs. The test results indicated that Mr. Hubbard tested positive for Tetrahydocannabinols.

On 03/02/10, Richard Cappello, DO ordered a urine screen to detect the use of drugs. The test results indicated that Mr. Hubbard tested positive for Cannbinoids and Opiates.

On 03/23/10 Dr. Albert Chang interpreted images.  He noted:

Study:        Chest two views.
Impression:  1. No acute cardiopulmonary process.
              2. No focal parenchymal abnormality detected.

On 03/27/10, Richard Cappello, DO ordered a urine screen to detect the use of drugs. The test results indicated that Mr. Hubbard tested positive for Cannbinoids and Opiates.

On 04/14/10 Dr. Richard Cappello drafted a letter of medical necessity that reads as follows:

Greg has traumatic brain injury and has severe post traumatic headaches and photophobia.  He is very light sensitive which triggerrs [sic] headaches.  He will benefit from car window tinting for medical reasons.

On 06/04/10 Dr. Brain Szymanski interpreted images.  He found:

Study:        Knee trauma Rt.
Impression:  No acute fracture or dislocation.

Hubbard, Greg

On 06/24/10 Dr. Shannon Nedelka conducted imaging procedures.  He specified:

    Study:       Knee trauma Lt.
    Impression:  Radiographically normal left knee.

On 07/06/10 Dr. Richard Cappello wrote a letter that reads as follows:

    Greg was involved in a MVA [in] August 2004.  He suffered a significant head
    injury with rt face fx, epidural hematoma, subarachnoid hemorrhage, rt orbit fx,
    etc.  He underwent craniotomy, drainage of hematoma and cranial fixation
    hardware.  Since then he has struggled with refractory post head trauma
    headaches and migraines.  These headaches are refractory to usual medications
    and pain management techniques.  Greg is maintained on high dose [of]
    morphine in order to tolerate these daily headaches.  He is unable to work due to
    these headaches and the required narcotic treatment for them.

On 07/13/10 Christopher Wheeler saw the patient.  He recorded:

    Impression:  Left knee pain, rule out lateral meniscus tear and a possible lateral
    tibial plateau fracture.

On 10/11/10 Dr. Walter Wrobleski examined the patient.  He concluded:

    Assessment:  The individual at this time does not appear addicted.  He is
    capable of performing jobs that require better than average intelligence and
    unfortunately he is in a position where because of the past medical history and
    surgical history requiring Klonopin and morphine with other therapeutic
    modalities tried and have been unsuccessful, he is probably a victim of
    circumstances.  However, this examination does not preclude him in my
    estimation from gainful employment at a certain level.

On 10/20/10 Dr. Jonathan Jaffe met with the patient.  He wrote:

    Blurred vision; numbness in right leg, arms and hands; left knee injury …

On 05/29/11 Dr. Shannon Nedelka performed imaging procedures.  She averred:

    Study:       MRI brain w and w/o co.
    Impression:  1. Normal MRI of the brain.
                2. Ethmoid and right maxillary sinus disease.

On 10/21/11 Dr. Robert Prescott conducted a comprehensive psychological evaluation.
He reported:

    Diagnoses:

Hubbard, Greg

| Axis I: | Panic disorder with agoraphobia; generalized anxiety disorder; depressive disorder, NOS. |
| Axis II: | Deferred. |
| Axis III: | Migraine headaches, history traumatic brain injury, arthritis and nerve damage in his back. |

Prognosis:  The claimant appears generally motivated for and able to engage in mental health treatment.

## ANALYSIS OF EMPLOYABILITY

Employability, technically defined is a status that "exists if a person possesses skills, abilities, and traits necessary to perform a job or jobs."[2]   McCroskey asserts that employability theoretically exists when "worker capacity equals or exceeds the demands of a job."[3]   When an individual's capacities, experiences and skills are equal to or greater than the demands of a job, the person has the **capacity** to perform the job or learn to perform the job.  Employability is solely a measure of individual capacity measured against job demands.  While interests associated with jobs are indicators of preference, not capacity, they nevertheless provide indicators as to what types of work and environment an individual prefers.

Labor market area and availability of jobs in a specific labor market must also be considered as certain occupations and professions are concentrated in various geographic regions.  Field indicates that placeability exists when "economic conditions and employer attitudes are such that a person can actually be placed in a job."[4]

This was done, as noted, using the **McCroskey Transferable Skills Program**, which matches and compares worker capacities against the demands of jobs to determine where the two intersect.  The program has proven over time, through continuous published, peer-reviewed research, to have a high degree of validity and reliability for measuring probable outcomes and entry point wages.  Job-Person Matching was done based upon his education, training and prior work experience, and the skills required in performing these jobs.  The vocational profile of worker traits for Mr. Hubbard was compared to all 12,775 jobs in the D.O.T. interfaced with a labor market survey of the most frequently hired for jobs in Mr. Hubbard's customary New Hampshire labor market, 2013.

This analysis revealed that Mr. Hubbard's profile matched 373 of the 1,214 most frequently hired for jobs in the New Hampshire labor market or approximately 31% of this job database, using the MTSP program.  Twenty three of the job titles were in a

---

[2] Field, T., 1993. **Strategies for the Rehabilitation Consultant**, p. I-7, Elliott & Fitzpatrick, Inc., Athens, GA.
[3] McCroskey, B.J., 1994. **Manual for the McCroskey Transferable Skills Program**, Expert Vocationologist Edition, Ver. 7., Vocationology, Inc., Minneapolis, MN.
[4] Field, op. Cit., pI-12

Hubbard, Greg

transferable skills category for which moderate to high levels of transferable skills were available. This means that at the time of his discharge from Tyco, there were 373 different jobs available to him to apply for that he had varying degree of transferable job skills. It should be noted that at his depositions, he could not identify any jobs that he had applied for following discharge from Tyco in February 2009.

The numbers of matching his vocational profiles for each of the 10 categories of work in the D.O.T. are indicated in **Table 1**

### TABLE 1
### Job Matches (By Job Category)

| No. of Job Categories | No. of Jobs |
|---|---|
| 0  Professional | 20 |
| 1  Technical | 94 |
| 2  Clerical/Sales | 124 |
| 3  Service | 48 |
| 4  Agriculture | 1 |
| 5  Processing | 9 |
| 6  Machine Trades | 13 |
| 7  Bench Work | 45 |
| 8  Structural | 1 |
| 9  Miscellaneous | 18 |
| **Total** | **373** |

These results are consistent with his functional capacities combined with his educational level and work history. The occupations that most closely matched Mr. Hubbard transferable skills include a range of quality control and food service job titles. A copy of the McCroskey transferable skills analysis results are attached to this narrative (See Attachment 5).


**EFFECT OF SUBSTANCE ABUSE HISTORY ON EMPLOYABILITY**


Based on his positive drug test results for marijuana in 2009 and 2010, it is within a reasonable degree of vocational certainty that Mr. Hubbard would not have been a candidate for a replacement job due to the practice of requiring drug test screen of job candidates by employers. Dr. Ward indicated in his testimony before trial (Page 20 line 3-10) that Mr. Hubbard related that his use of Marijuana was ongoing and that "he sometimes smokes marijuana to relax during these exacerbations" (e.g., headache pain).

By virtue of his drug use, Mr. Hubbard had a self-imposed, precarious future employment outlook. Effectively his marijuana use rendered him unable to do what is

Hubbard, Greg

normal in attempting to mitigate lost earnings.  Reasonable effort should include the following:

- Networking with former co-workers, colleagues, and friends

- Posting his  resume and searching job boards for job openings in his occupation

- Working with recruiters and search firms

- Making direct face-to-face contact with company personnel departments

- Making direct inquiries to companies through email and websites

Mr. Hubbard's job search efforts did not include any of these methods.  He testified during his deposition (Page 266, line 8-18) on June 8, 2012, that he stopped looking for work after August 2010.  He also indicated that his efforts were limited to:

> "Basically going down to the unemployment office, putting in applications for manager position, quality control things of that nature."

Mr. Hubbard was only able to recall making one QA Inspector job application at a water filtration plant in Dover.

In addition to his likelihood of being screened out as an employment candidate, Mackin, Horner, Harvey & Stevens (2005) note that individuals dealing with substance abuse problems frequently have employment issues including being unable to attain or maintain employment, stress management, absenteeism and promptness.[5]

## OCCUPATIONAL OUTLOOK/LABOR MARKET ANALYSIS

Mr. Hubbard was discharged from his job as a Senior Quality Analyst on February 12, 2009 at Tyco.  It can reasonably be assumed that from February 2009 until his urine tested positive for Marijuana, he would have been employable in similar jobs in his labor market.  The labor market outlook for this type of job position was favorable in 2009.  With a diligent job search, he would have been likely to find a replacement job in his local labor market.

Placeability is also a significant determinant of successful reintegration into the workforce.  In regards to placeability, from February 2009 until April 2009, he was placeable in his customary occupation.  Following his positive urine tests for marijuana use, he was no longer placeable in these types of jobs.  It was and continues to be

---

[5]  **The relationship between neuropsychological measures and employment problems in outpatients with substance abuse.** Mackin, R.S., Horner, Michael, D., Harvey, R. T., Stevens, L. A., 2005, *Rehabilitation Psychology*, (50)2, 158-163.

Hubbard, Greg

customary employment policy to request a drug screen prior to offering employment to candidates.  It is likely that upon testing positive for marijuana, he would not have been offered a job position in his labor market.

## Quality Control Inspectors

Mr. Hubbard has a history of working as a Quality Control Inspector.  The **Occupational Outlook Handbook, 2012 - 2013** states the following about the outlook for the occupation of Quality control Inspectors:

- Employment of quality control inspectors is expected to grow 8 percent from 2010 to 2020, slower than the average for all occupations. Projected employment growth reflects the continuing need to have quality assurance testing in a variety of manufacturing industries, particularly in pharmaceuticals and medical equipment.

- Despite technological advances in quality control in many industries, automation is not always a substitute for inspecting by hand. Automation will likely become more important for inspecting elements related to size, such as length, width, or thickness. But inspections will continue to be done by workers for products that require tests of taste, smell, texture, appearance, complexity of fabric, or performance of the product.

- Nonetheless, many manufacturers have invested in automated inspection equipment to improve quality and productivity. Continued improvements in technology allow manufacturers to automate inspection tasks, increasing workers' productivity and reducing the demand for inspectors.

- Manufacturers increasingly are integrating quality control into the production process. Many inspection duties are being reassigned from specialized inspectors to fabrication and assembly workers, who monitor quality at every stage of production. In addition, the growing use of statistical process control results in smarter inspections. Using this system, manufacturers survey the sources and incidence of defects so that they can focus their efforts on reducing the number of defective products. These factors are expected to result in less demand for quality control inspectors.[6]

Growth rates for this occupation were comparable in 2009.  Individuals with inspection and manufacturing experience similar to Mr. Hubbard's work history would be more competitive candidates.

---

[6] Bureau of Labor Statistics, U.S. Department of Labor, *Occupational Outlook Handbook, 2012-13 Edition*, Quality Control Inspectors, on the Internet at http://www.bls.gov/ooh/production/quality-control-inspectors.htm.

Hubbard, Greg

## VOCATIONAL BARRIERS

Although Mr. Hubbard had the prerequisite education, training, skills and aptitudes necessary to be employed in his customary occupation, he is alleging that his placeability and career development have been negatively affected by the events and actions taken by Tyco during the period of February 12, 2009 until his disablement on April 1, 2011.  Specifically he is claiming that:

> The nature of his employment termination by Tyco negatively affected his employability and impaired his career development and earning capacity.

In my opinion, Mr. Hubbard's ability to re-enter his chosen career at a comparable level of responsibility and earning capacity was not affected by his termination from Tyco, but from his use of marijuana which would have eliminated him from consideration as an employment candidate and his failure to take reasonable efforts to obtain replace.

Although his employment was terminated in February 2009, his viability as a Senior Quality Analyst was maintained until he tested positive for use of marijuana.  There is no indication in the records reviewed for this evaluation that he conducted a diligent job search process to obtain replacement employment.

## EARNING CAPACITY

Mr. Hubbard is alleging that he incurred a loss of earning capacity of $173,471 from February 12, 2009 through April 1, 2011. Facts show that the period for calculating loss of earnings is more accurately reflected using the period of February 12, 2009 through April 7, 2009, when Mr. Hubbard's urine tested positive for marijuana use.  This period of time covered approximately 38 work days.

When projecting future earning capacity of individuals, actual earnings should be considered along with the availability of jobs in the labor market and business trends.  In addition, it is important to consider the placeability of that individual skills and aptitudes associated with the person's job experience, and transferability of those skills to appropriate labor markets.  Finally, any vocational impairments or barriers to employment should be considered that would influence an employer including drug use patterns.

Mr. Hubbard's potential earning capacity is influenced by his educational background, previous earnings, and employment history.  However, as noted it is important to consider the whole person including any significant deficits that may impede re-employment.  On April 7, 2009, Mr. Hubbard presented with a significant vocational barrier as an employment candidate, resulting from his ongoing use of marijuana.

Mr. Hubbard was earning $20.63 per hour, plus a shift differential.  His W-2 Wage and Tax Statement from 2008 shows gross wages of $58,273 (equivalent of $28.02 based

Hubbard, Greg

on 2,080 work hours per year). Assuming that he was available for work following his termination from Tyco on February 12, 2009, Mr. Hubbard's earning capacity until April 1, 2009 when he first tested positive for marijuana use was $8,518.08.

## SUMMARY

Within a reasonable degree of vocational certainty Mr. Hubbard's capacity to return to work as a Senior Quality Analyst was not affected by his termination from Tyco but rather by his use of marijuana which would have precluded him from consideration as a job candidate in similar positions. His current vocational situation including unemployment has been affected by his serious medical condition that eliminates him from any work activity in the future.

In summary, based on the results of the vocational evaluation of Mr. Hubbard, and considering his age, education, past work experience, the following are my opinions within a reasonable degree of vocational certainty regarding Mr. Hubbard's employability and earning capacity:

1. Mr. Hubbard's employment record indicates that his employment as a Senior Quality Analyst for Tyco was terminated in February 2009.

2. Mr. Hubbard failed to mitigate his loss of earnings by ceasing to search for replacement employment and by using marijuana which rendered him unqualified for employment.

3. For the 373 job titles identified with the MTSP, wages at the 25th percentile in Stafford County, New Hampshire were $13.36 per hour or approximately $27,789 per annum. Median (50th percentile) wages were $17.51 per hour or approximately $36,421 per year. Mean wages were $18.85 per hour or approximately 39,208 per year. By virtue of his prior work experience, Mr. Hubbard would have been a candidate for these wage earnings.

4. Mr. Hubbard was fully capable of obtaining alternative work at the time of his termination from Tyco Integrated Services. His employability and placeability in comparable jobs, career development and earning capacity were not negatively affected by the nature of his employment termination from Tyco Integrated Services.

5. Mr. Hubbard's placeability and earning capacity were affected by his continued use of marijuana which precluded him from employment due to personnel policies against drug use and the practice of requiring drug test screen prior to making employment offers.

6. At most, Mr. Hubbard lost income of approximately $8,518.08 from February 9, 2009 to April 1, 2009 when he tested positive for marijuana use.

Hubbard, Greg

If additional information is made available, I reserve the right to amend my conclusions as needed.

Respectfully submitted:

Charles Kincaid, Ph.D., CRC, CVE, ATP, CLCP
Licensed Rehabilitation Counselor (NJ License #: RC00042)
Certified Vocational Rehabilitation Counselor
Fellow, American Board of Vocational Experts
Assistive Technology Practitioner
Certified Life Care Planner

17

Hubbard, Greg

## RESOURCES AND REFERENCES

1) **Dictionary of Occupational Titles** Revised 4th edition, 1992, U.S. Department of Labor Employment and Training Administration, Government Printing Office, Washington, D.C.

2) **The Revised Handbook for Analyzing Jobs**, 1991, U.S. Department of Labor, Employment and Training Administration, Government Printing Office, Washington,  D.C

3) **Occupational Outlook Handbook**, 2012-2013 Edition, U.S. Department of Labor, Bureau of Labor Statistics, U.S. Government Printing Office, Washington, D.C.

4) **A Guide to Rehabilitation**, Deutsch, P. and Sawyer, H., 2004, Matthew Bender and Company, Albany, NY.

5) **Vocational Assessment:  Evaluating Employment Potential**, Havranek, J., Grimes, J., Field, T. and Sink, J., 2005, Elliott & Fitzpatrick, Inc., Athens, GA.

6) **Rehabilitation Consultant's Handbook**, Field, T. and Weed, R., 2003, Elliott & Fitzpatrick, Inc., Athens, GA.

7) **Strategies for the Rehabilitation Consultant**, Field, T., 1999, Elliott & Fitzpatrick, Inc., Athens, GA.

8) **Manual for the McCroskey Transferable Skills Program**, Updated 2013, McCroskey, B.J. Brooklyn Park, MN.

9) **The O\*Net Dictionary of Occupational Titles**, JIST Work, Inc., 2007. Indianapolis, IN.